# A SAFE CITY FOR ALL; IF WE DO NOT GO DEEP, WE WILL NOT GO FAR.

# CONTENTS


**EXECUTIVE SUMMARY** **10**

**TASK FORCE RECOMMENDATIONS**

1: Community Policing 16

2: Independent Oversight 30

3: Power Dynamics 48

4: Crisis Intervention 74

5: Field Readiness 96

6: Clear Expectations 120

**CONCLUDING THOUGHTS** **128**

The Task Force 130

Acknowledgments 132

**APPENDICES**

Appendix A: "For Such a Time as This" 134

Appendix B: "Must-reads on policing reform" 135

Appendix C: "Additional work on body-worn cameras ("BWC")" 136

Appendix D: "Comparison of the HPD's CIRT model to national standards" 142

Appendix E: "Other law enforcement collaborations with the HPD Mental Health Division" 144

**NOTES AND CITATIONS** **146**

## June 2020 was a busy month for Mayor Sylvester Turner.

On June 9th, he signed Barack Obama's Mayor's Pledge, committing to "take action to address the concerns of Houstonians & to continually improve justice & equity for all." On June 10th, he signed Executive Order 1-67 on Policing Reform: Use of Force, laying out several policing reform measures, such as banning the use of chokeholds, requiring officers to intervene if they see another officer using excessive force, and exhausting all reasonable alternatives before using deadly force. Additionally, as the second vice chair of the African American Mayors' Association, Mayor Turner vocally supported the PEACE Pact for Community Centered Policing, and on June 24th, announced the Mayor's Task Force on Policing Reform ("Task Force").




Mayor Turner gave the 45-member Task Force up to 90 days to make recommendations in police training, use of force, oversight, and interactions with the community. Officially, we were charged with reviewing: the current policies and practices of the Houston Police Department ("HPD"), including use of force, recruiting, training, and reporting; the operation of the Independent Police Oversight Board ("IPOB"); the use of a body-worn camera ("BWC") and associated release policies for video footage; the HPD's model of crisis intervention; and the HPD's approach to, and implementation of, community policing.

A critical charge, though not explicitly stated by the Mayor, was to listen to and engage with Houston community members. During this process, members of the Task Force spoke with numerous community stakeholders, including social services professionals, advocates, business leaders, youth, students, educators,




religious leaders, and community groups. We received letters and additional input from Houston City Council members, current and former HPD Chiefs and Executive Assistant Chiefs, current and former IPOB members, alumni of local Black fraternity chapters, current HPD officers, current Houston Police Officers' Union ("HPOU") members, youth members of Houston Peace, and others. Additionally, the Houston Area Urban League and Houston Peace both took the initiative to create their own community input surveys, and generously shared their results with the Task Force.

One of our most valued resources was the collection of over 7,000 stories and recommendations from Houston residents. On July 31st, the Task Force launched a questionnaire, asking Houstonians to provide their views on the HPD and whether they would recommend any improvements to the HPD. We initially planned to keep the survey live for one week, but, after receiving an overwhelming response from the community, we kept the survey open for three weeks. Houstonians had the option to respond in five different languages and received the survey link from roughly 100 different community organizations, social media, City Council members, and word of mouth.

While the survey responses are not considered statistically significant (given the lack of budget required to reach a representative sample), the stories made a significant impact on us. In a meeting with the HPD Chiefs, each Task Force member stood up and read a Houstonian's story out loud. These stories and suggestions helped guide and confirm our collective ideas and recommendations.

Of the 7,302 responses, 24% view the HPD "Very Positively," 25% "Positively," 21% "Neutral," 19% "Negatively," and 11% "Very Negatively." Critically, desire for improvement and reform do not come from just those who hold negative perceptions of the department. In fact, of those who view the HPD "Very Positively," "Positively," or "Neutral," 76% believe that improvements are needed.

This finding reinforces our belief that asking for bold changes and reforms should not be viewed as disrespectful, ungrateful, or political in regard to law enforcement. Any organization should strive to create better outcomes for their stakeholders.

We believe our proposals will help balance the scale; at the end of the day, we want both the HPD officer and the civilian to go home to their families. Policing should not be interpreted as an "either/or" relationship. It is a "both/and" relationship that requires and deserves mutual respect, partnership, and understanding.

**Fig 1.** Results from Citywide survey show overwhelming support of Houstonians (83%) for improvements or changes to the HPD



# RECOMMENDATIONS

This report urges Mayor Turner, the Houston City Council, and the HPD to take action. We ask them to reimagine Houston public safety by implementing the following reforms:

### 1: COMMUNITY POLICING

Integrate respectful, consistent, and meaningful community engagement and input into existing work practices, including recruiting, training, patrolling, and promoting.

### 2: INDEPENDENT OVERSIGHT

Overhaul the current IPOB to support a full-time, paid administrative and investigative staff, accompanied by a diverse civilian board, to hold the HPD accountable to a higher standard.

### 3: POWER DYNAMICS

Balance the power dynamics between the HPD and Houstonians by releasing body-worn camera footage of critical incidents in a consistent and timely manner, further restricting the use of force, treating people with due respect, and committing to fundamental transparency by releasing audit and performance data on a regular basis.

Expand existing partnerships between the HPD, mental health professionals, and social services organizations to lighten the load on officers when responding to vulnerable populations, such as those experiencing mental health crises, domestic violence, human trafficking, substance abuse, and homelessness.

### 5: FIELD READINESS

Equip and prepare officers for better engagement in the field through initiatives like reviewing and updating officer training, expanding mental health and wellness programs for officers, and instituting a mentorship program.

### 6: CLEAR EXPECTATIONS

Set clear and unambiguous expectations for officers so that they feel supported, know exactly what behavior is required, and understand the consequences of their action or inaction.

There are a few things to keep in mind when reading through the report:

1. **When we use the term "diversity," unless otherwise noted, we mean the full spectrum of diverse communities in the City of Houston.**
   This means diversity along the dimensions of race, age, religious beliefs, ethnicity, sexual orientation, gender expression and identity, national origin, socioeconomic status, education level, ability, political beliefs, and immigration status.
2. **This series of reforms is written for the City of Houston.**
   Every city is different. While we have incorporated national best practices and inspiration from other cities' reports, all recommendations have been specifically tailored to our City.
3. **Necessary budget and funding were beyond the scope of the Task Force.**
   We acknowledge that some of our recommendations will require additional funding and recognize fundraising as a critical step toward implementation. That said, we implore the Mayor, City Council, and the HPD to explore partnerships, grant applications, and otherwise exhaust other reasonable options before declaring that something cannot be done due to a lack of funding.
4. **It is critical to track the implementation and subsequent effects of reforms.**
   It is not enough to pledge to take action; action must be monitored, and results must be analyzed to ensure accountability and positive impact.
5. **This is just the beginning.**
   Some of these reforms can be implemented within 90 days. Some may take a year or longer. This is just the first step in an evolving, long-term partnership that will continue to require community and law enforcement collaboration.

## Finally, to all Houstonians: to those who live here; those who work here; those who are from here; those who call this City home.

## This report is for you.

Yes, the Mayor and City Council members and other civic leaders will read this. But, you'll find that every section is written and designed for Houston community members, including our police officers. Your stories and suggestions are woven into this document. Some of us, too, have been marching in the streets. Some of us, too, have signed petitions, demanded change, and called for justice. We hope that you will stand with us now as we urge our leaders for change to create **a safe city for all.**

"The policing mindset has to change. Too often, I hear police speaking of their jobs as "us vs. them."

But, real respect doesn't come from holding a weapon. It comes from having earned that respect."

—TASK FORCE SURVEY RESPONDENT

# Community Policing

Integrate respectful, consistent, and meaningful community engagement and input into existing work practices, including recruiting, training, patrolling, and promoting.

## WHAT IS COMMUNITY POLICING?

Community policing, as defined by The Leadership Conference on Civil and Human Rights,[18] is a method of policing that:

- Engages all community members in meaningful decision-making, implementation, and evaluation of departmental policies, practices, and priorities.
- Values community perspectives, especially of those most impacted by policing.
- Emphasizes prevention and problem-solving over arrests and criminalization.
- Promotes fair and equal treatment of all community members.

Community policing recognizes that the police can rarely solve all public safety problems alone. This approach to policing encourages interactive and collaborative partnerships with the community to accomplish two complementary goals:

1. Improve public safety.
2. Strengthen public trust.

In this section, we will discuss ways in which the HPD can more actively engage in community policing practices.

## *DO WE PRACTICE COMMUNITY POLICING IN HOUSTON?*

Yes. In fact, Houston holds a unique place in the history of community policing. Dr. Lee P. Brown, the former Chief of HPD (and the City's first African American Chief) and former Mayor of Houston, literally wrote the book on community policing, entitled *Policing in the 21st Century: Community Policing*. Dr. Brown defined community policing (or "Neighborhood Oriented Policing") as "an interactive process between police officers assigned to specific beats and the civilians that either work or reside in these beats to mutually develop ways to identify problems and concerns and then assess viable solutions." Dr. Brown called this method of policing "a partnership," and under his leadership, the department made several advances, including:

- Diversified the HPD to better reflect the overall diversity of Houston.
- Established the Positive Interaction Program ("PIP") to involve civilians in fighting crime by establishing committees in selected areas.
- Created more patrol units that conducted their duties outside of a vehicle, including the Mounted Patrol and the Park Police.
- Mandated annual in-service training hours for existing officers.

## *I'VE HEARD CHIEF ACEVEDO TALK ABOUT "RELATIONAL POLICING." IS THAT THE SAME AS COMMUNITY POLICING?*

The Task Force believes it is similar, if not mostly the same. As Chief Acevedo describes it, "relational policing" is "an opportunity to forge a relationship with each and every person an HPD member comes in contact with" by "treating people the way you would want to be treated." This philosophy is included in the HPD's training curriculum with the acronym "TREAT" (Transparency, Respect, Engagement, Accountability, and Trust). After speaking with Chief Acevedo, he shared that he was hesitant to use the term community policing because too many departments think of it as programming that requires additional funding (and therefore without additional funding, they will not do it). While we agree that funding should not be used as an excuse to stop reaching out to the community, we do think relational policing needs to encompass both respect and community outreach and partnerships.

The HPD shared the following examples of relational policing initiatives currently in practice:

1. Houston Citizens Police Academy ("HCPA") offers Houstonians an opportunity to learn about the internal operations of HPD.
2. Police and Clergy Alliance ("PACA") is a volunteer program for clergy and laypersons of various faiths and religious beliefs to work with the department to

build trust and respect with the public to facilitate law enforcement.

3. Greater Houston Police Activities League ("GHPAL") is a partnership with the Houston Parks and Recreation Department that provides year-round youth sports for Houstonians ages 9-17.
4. "Comunidad y Confianza" is a Spanish Radio Show with "The Triple C Podcast" that utilizes mass media to augment and enhance the normal response to daily crime and civility issues faced by residents of Houston.
5. Community Liaison Officers are full-time officers assigned to special interest groups throughout the City.
6. Houston Law Enforcement Alliance of Pride ("LEAP") is a group of LGBTQ+ and ally law enforcement officers and civilians that provides a safe environment for members to voice issues and receive support.
7. Communicators on Patrol is a group of volunteers from the community that are recruited to enhance language access between HPD officers and civilians. The volunteers assist patrol officers "on the scene" by handling communications and translations for several languages.

## *IF THE HPD ALREADY OPERATES THESE PROGRAMS, DO THEY REALLY NEED TO DO MORE?*

The Task Force is not necessarily advocating for more *programming*. Instead, we are advocating for the HPD to do more to *integrate community voices into their daily work,* including during recruiting, training, patrolling, and promoting.

Existing community policing programs are structured for the community to interact with law enforcement at a physical location, such as a command center, or on a call hosted by community groups. Communities with preexisting tensions and fractured relationships with law enforcement are less likely to take the initiative to join a Super Neighborhood call or PIP meeting. Therefore, initiatives created to induce community partnerships should be structured for police officers to proactively engage with community members.

> "I'd like them to be intentional about building relationships... actually being part of the community so that they are viewed as community members who are invested in the lives and successes of all residents."
>
> —HOUSTON AREA URBAN LEAGUE SURVEY RESPONDENT

## ***WHAT ARE THE MOST IMPORTANT STEPS THE HPD CAN TAKE TO IMPROVE ITS COMMITMENT TO AND EXECUTION OF RELATIONAL POLICING?***

### 01

### Incorporate up to three weeks of community engagement into cadet training.

The Task Force believes that one of the most important outcomes of officer training is for an officer to know, appreciate, and appropriately respond to the individuals, communities, and neighborhoods they will serve. Currently, the only community engagement that prospective cadets receive outside of the classroom is an eight hour "Multiculturalism / Diversity Neighborhood Tour." A one-day neighborhood tour of Houston communities can hardly be considered enough time for officers to really get to know communities different from their own.

The Task Force recommends expanding cadet training by three weeks so that each recruit can be paired with a community organization in Houston for a three-week "externship." For example, a recruit might work with the Houston Area Women's Center, shadowing staff, speaking with domestic violence experts, and getting to know people who have been in domestic abuse situations. A recruit might be paired with Star of Hope to get to know members of the homeless community while serving meals, or work at the Houston Area Urban League's Economic Empowerment Center to better understand the needs of minority business owners.

Community collaborations such as these will enable cadets to gain compassionate exposure to groups of Houstonians who may not look or live like them, while also organically developing community partnerships prior to moving into their full-time positions.

## 02

## Include out-of-the-classroom activities into people- and place-based training.

The Academy should utilize multidisciplinary teaching teams and experiential learning to complement traditional lecture-style training. For example, at the New Haven Police Department, "The Sex Industry Workers" course is taught by a Yale professor, three prostitutes, and a police officer, and the "Domestic Violence" course is taught by a prosecutor, a resident from a local shelter, and a court-appointed victim's advocate."[19]

When it comes to experiential learning, traditional classroom lectures on mental illness, for example, could be supplemented by interviews with people who have mental health service needs, visits to mental health service facilities like The Harris Center's Mental Health Diversion Center, and meetings with families or caregivers.

## 03

## Include a "Community Engagement" section on patrol Work Cards to ensure civilian and business engagement takes place. Require officers to make personal contact with at least two people or businesses during each shift.

Patrol activity sheets have record options for arrest activity but no record options for community engagement. Chief Acevedo plans to require officers to have at least two out-of-car engagements with civilians and/or businesses during each patrol shift, and the Task Force supports this initiative. This effort will help the HPD proactively reach out and engage with civilians who might not be those present at structured meetings or neighborhood town halls.

## 04 Update the promotion process to include a third component: an internal panel with community representation.

Currently, there are two components in the promotion process for police officers: a written examination and an assessment component conducted by a third-party assessor. In conversations with the Task Force, Chief Acevedo shared his recommendation to include an additional third component. He and the Task Force recommend adding an internal interview, during which an officer would share their resume, their statement of qualifications, and answer questions.

Following the interview, a small internal panel of officers and a community representative would make the final call, taking into account all three components. Inviting community members to participate adds diversity and transparency to the process, strengthening community trust in the system.

## 05 Partner with local research agencies and/or universities to conduct regular community input surveys and publish the results publicly.

Collaborations with agencies and local colleges/universities can be a start in creating and conducting surveys within respective communities. Similar to the Census, surveys can be conducted based on ZIP codes, and information gathered will measure effectiveness of police strategies, community views toward and trust in the HPD, and suggestions for improvement.

These surveys can help the HPD better understand how perceptions vary by neighborhood, age, race, gender, and other characteristics, allowing them to update strategies or invest resources accordingly. Actions that the HPD takes in response to the surveys should be shared publicly so that the community is aware of their impact.

## 06

Devise specific ways of measuring the impact of relational policing, including but not limited to: credibility with the community, number and type of civilian complaints, crime rates, number of fatal shootings of unarmed civilians, and response time.

Using specific metrics will hold the HPD accountable to the community and help the HPD make more effective investments of their resources and time. For all of the relational policing programs described above (e.g., PACA or GHPAL), the HPD should provide public, annual reports on the activities, successes, and improvements made to each program.

## ***WHAT ADDITIONAL INITIATIVES CAN THE HPD TAKE TO ENSURE THEY CONTINUE TO UPHOLD THEIR COMMITMENT TO COMMUNITY PARTNERSHIPS AND RELATIONAL POLICING?***

## 07

Contract with a technology company that will allow people to provide real-time feedback about their experiences with HPD officers.

Chief Acevedo shared that the HPD is meeting with companies to identify opportunities to solicit civilian feedback on officer interactions (e.g., a text message or email asking, "How did we do?" once a case is cleared). Similar to how ride-sharing or food delivery services ask for real-time feedback, this initiative will give the community an immediate opportunity to provide comments on their interaction with HPD officers. This feedback could also be incorporated into officer evaluations and the promotion process.

## 08

### Include a "bonus point" in promotion considerations for those who have a history of community involvement, service, or leadership.

Creating an incentive structure for community-based activities and achievements demonstrates that public engagement is just as important as any other policing activity. Further, acknowledging community engagement in the promotion process solidifies participation in the community as an integral part of the department's culture. The New Haven Police Department gives officers up to four extra points for longstanding involvement or a leadership role in the community. Some agencies, such as the Pueblo County Sheriff's Department, take this notion a step further, mandating demonstrated, ongoing community service as a prerequisite to promotion.[20]

## 09

### Create a residency incentive program to encourage HPD officers to reside in the City of Houston.

Residency incentives can help affirm the connection between officers and the communities they serve. While there is no scientific proof that the requirements have created a better police force, officers who live in Houston neighborhoods have the opportunity to play a more active role in our communities by living in them. Incentives could include reduced home loan rates for officers within city limits and/or increased salary packages, with the stipulation that community involvement is required.

## 10

### Ask for community input and feedback on recruiting materials to ensure resonant messaging.

The HPD can invite community members from diverse backgrounds to participate in focus groups that evaluate different HPD recruiting slogans, images, and approaches. Focus group members can also help develop recruiting strategies directed toward specific communities, sponsor officer presentations, and serve as HPD ambassadors within the community.

## 11

### Assign officers to neighborhoods on a long-term basis.

Stability is essential to developing positive relationships and building trust. A stable assignment provides officers an opportunity to learn more about and participate more fully in the life of the community.

## 12

### When a long-term officer changes assignment, provide a transition plan and make sure the new officer is properly introduced to the neighborhood.

Sometimes, civilians in certain communities build deep bonds with and rely on long-serving officers. To address this, HPD should develop transition plans that are communicated to the neighborhood and allow overlapping time for the outgoing and incoming officers to serve together. The outgoing officer can help introduce the incoming officer to community members, share institutional knowledge, and make the transition easier for both parties.

## 13

### Continue to host informational meetings (Positive Interaction Program meetings, "PIP") with the community on a consistent, quarterly basis in each Super Neighborhood.

Though not all residents will show up, consistency is essential to continue to establish open, two-way communication and trust. Neighborhood leaders and participants will be able to share input with officers and learn about officer activities and initiatives.

## 14

### Take PIP a step forward by creating specialized support teams in each Super Neighborhood to help identify recurring neighborhood problems and brainstorm solutions.

For example, the San Diego Police Department created Neighborhood Police Support Teams to help officers identify recurring neighborhood problems and think beyond their usual reactive responses to developing long-term solutions.[21] Forming this type of team could be as straightforward as including civilian representation on the HPD's existing Differential Response Teams.

## 15

### Utilize grant funds in creative, productive ways that benefit the community.

Police departments typically receive outside funding, such as US Department of Justice grants, to support their community-based efforts. The HPD could use these grants to award its own sub-grants to local community groups who submit specific plans for assisting in crime prevention or advancing community policing efforts.

## 16

### Pilot a "mobile storefront" concept in which a small team of officers park in different neighborhoods across Houston, specifically to interact with residents and listen to their input.

Instead of adding more brick-and-mortar storefronts in select areas, test out one or two mobile storefronts that drive into different communities. Officers should be present to encourage resident interaction and listen to community needs. As a pilot test, it will be critical to measure the impact of this initiative before investing in any expansion.

"I am intimidated by [the police] because I never see them inside the community—only when accidents happen and tickets are...written. I want a relationship with my local police force. I don't think I should be afraid or dislike them, but they don't seem like part of the community."

—TASK FORCE SURVEY RESPONDENT

KEY TAKEAWAY

—

## Through community partnerships, shared problem-solving, and proactive engagement, the HPD can advance public safety and strengthen community trust.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

SHORT TERM
WITHIN 90 DAYS
—

**03:** Personal contact on patrol
**05:** Community input surveys
**06:** Measurements for relational policing
**08:** "Bonus point" for promotion
**10:** Community input on recruiting
**11:** Long-term assignments
**12:** Transition planning
**13:** PIP meetings
**15:** Grant funds
**16:** "Mobile storefronts"

MEDIUM TERM
WITHIN 6-12 MONTHS
—

**01:** Community engagement in cadet training
**02:** Out-of-classroom learning
**04:** Promotion process
**07:** Real-time feedback
**09:** Residency incentive program
**14:** Neighborhood police support teams

LONG TERM
1 YEAR+
—

*N/A - continue to build on proposed initiatives*

# INDEPENDENT OVERSIGHT

Overhaul the current IPOB to support a full-time, paid administrative and investigative staff, accompanied by a diverse civilian board, to hold the HPD accountable to higher standards.

## WHAT IS THE IPOB AND WHEN WAS IT CREATED?

The Independent Police Oversight Board ("IPOB") is a group of 21 volunteer citizens tasked with reviewing the HPD's completed internal affairs investigations involving a death in custody, allegations of excessive force, or discharge of a weapon. The current Board is composed of four panels (A, B, C, and D) of five citizens. The full Board is led by a single chair, and each panel has a panel chair. In its current form, the IPOB is not an investigative agency and has no budget, staff, disciplinary authority, or investigative tools. The IPOB only provides independent review of what the HPD investigations reveal to have occurred.

The IPOB's origins can be traced to the 1977 murder of Jose Campos Torres. Mr. Torres was a 23-year-old Mexican American Vietnam War veteran who, after being arrested for disorderly conduct, was severely beaten and thrown into Buffalo Bayou by six HPD officers. Two of the officers received minimal sentencing (a one-year probation and a $1 fine) and eventually, nine-month sentences in federal prison. On the anniversary of Mr. Torres' death, the Houston community reacted with outrage, leading to the 1978 Moody Park Riot, one of the most violent riots in the City's history. Following the riot, HPD's Chief of Police Harry Caldwell created the Internal Affairs Division ("IAD") to investigate allegations of serious police mistreatment of civilians.

A decade later, in 1989, the separate killings of Ida Lee Delaney and Bryon Gillium by police officers led Mayor Kathy Whitmire to establish a volunteer Citizens Review Committee ("CRC") to determine whether IAD investigations into complaints of police brutality and excessive force were complete, their conclusions correct, and the disciplinary recommendations appropriate.

Then, in 2011, security camera footage was released showing a dozen HPD officers beating an unarmed 15-year-old student named Chad Holley. This incident again sparked community and national outrage, leading Mayor Annise Parker to propose a "sweeping package of new initiatives aimed at restoring public trust in the HPD." The package included creation of the IPOB to replace the CRC.

## A GROUP OF CITY COUNCIL MEMBERS SAID RECENTLY THAT THEY "HAVE NO CONFIDENCE IN THE CURRENT FORMAT" OF THE IPOB. WHAT DOES THE TASK FORCE THINK?

We agree. The current model contains several structural and legal impediments which have hindered (and in some cases, entirely prevented) the IPOB from meaningfully discharging its functions and achieving its intended effect.

The IPOB also fails to fulfill all of its duties, as outlined in Executive Order ("EO") 1-5. The EO assigns the IPOB responsibilities in assessing the recruitment, training, and evaluation of police officers and in offering substantial involvement in community outreach. However, those functions have not been performed. The EO also provides for considerable participation in the independent oversight process by the City's Inspector General, though that function, too, has been generally unfulfilled.

It is important to realize that the IPOB—at its core—is not, and was never modeled to be, an investigative agency. The Task Force recommends changing the IPOB from a review model to an investigative model.

## TELL ME ABOUT THE DIFFERENT MODELS OF CIVILIAN OVERSIGHT.

There are five common goals of civilian oversight of police activities:

1. Improve public trust
2. Promote thorough, fair investigations
3. Deter police misconduct
4. Ensure accessible complaint processes
5. Increase transparency

The National Association of Civilian Oversight of Law Enforcement ("NACOLE") has identified three types of civilian oversight structures for achieving these objectives:

**Auditor/Monitor Model:** This model calls for a review of the completeness and thoroughness of IAD investigations, or a monitoring of the entire internal investigations from beginning to end. Monitoring is conducted by an agency or public official unrelated to the police department or other law enforcement entity.

**Investigative Model:** This model generally involves a publicly funded agency which investigates complaints of police misconduct independently of the police department itself.

**Review Focused Model:** This model involves a civilian board or panel, composed of unpaid, volunteer members of the community. The board examines the quality of internal affairs investigations and the conclusions and recommendations resulting from inquiries conducted by the department.

## *WHAT MODEL DOES THE TASK FORCE RECOMMEND?*

For the IPOB to achieve its fundamental purpose—to hold the HPD accountable to the public—the Board must be reconstituted as a new organization with investigatory powers.

**The Task Force concludes that a hybrid model, utilizing a full-time, paid professional staff accompanied by a diverse, volunteer civilian board, is best suited for Houston.** The loss of public trust and credibility makes it difficult, if not impossible, for the police to forge partnerships in local communities, let alone expect community cooperation in criminal investigations. This model will work to rebuild community confidence by holding police officers accountable through effective, transparent, and independent oversight.

We recommend the following criteria be considered when rebuilding the IPOB:

1. The IPOB needs to have its own funding and budget, including funds and facilities for professional investigative and administrative staff, separate from and independent of the HPD's funding and budget.

   The investigative staff shall be dedicated to independent investigation of instances of police misconduct. Staff shall also review existing and proposed HPD policies, and recommend reforms related to HPD's recruiting, hiring, promotion, disciplinary, and termination measures.

   The administrative staff shall be responsible for carrying out the Board's mission on a day-to-day basis, in addition to evaluating systemic issues and raising awareness of the Board in the community.

2. The paid staff and the civilian board shall have ample authority to investigate and review cases of police misconduct. Some might advocate for investigative tools such as subpoena power, though NACOLE advises, "if you are unable to [include subpoena power in the agency's enabling legislation], this is not a roadblock to effective civilian oversight."[22]

3. The hybrid model will preserve diverse civilian involvement by accompanying the paid staff with a Civilian Review Board that is primarily responsible for reviewing civilian complaints against the HPD.

Clearly, additional measures and exact details for the future structure of the Board need to be duly considered. These recommendations should serve as the initial vision for the Mayor and/or future Mayors to craft a stronger Board for our City.

## WHAT ADDITIONAL CHANGES NEED TO BE MADE, AT THE STATE OR CITY LEVEL, TO FURTHER IMPROVE THE INVESTIGATIVE PROCESS?

### 01 Change the "180-day rule" from the date alleged police misconduct occurred to the date the misconduct was discovered by the department.

Under Chapter 143 of the Texas Local Government Code, law enforcement agencies have 180 days from the date that alleged misconduct occurred to impose discipline on an officer. However, acts of misconduct are not always reported to the department on the day of occurrence, meaning that departments can lose valuable time needed to fairly investigate incidents. Changing the rule to date of discovery will allow for more fair and thorough investigations.

### 02 Increase the time available for imposition of discipline upon officers found to have engaged in improper conduct from 180 days to 210 days.

This change to Chapter 143 of the Local Government Code is necessary to allow sufficient time for a thorough investigation and adequate deliberations by the IPOB.

### 03 Require officers involved in incidents in which their conduct is under scrutiny to make statements at the beginning of the investigation.

The current "Meet and Confer" agreement between the City and the HPOU needs to be changed. Current practice allows officers to defer making statements until after the investigation is complete and officers can read the entire file. Officers should be able to revise their original statements after reading the file, but not to postpone making an initial statement. Current policy may lead to a tainted and untrustworthy investigation.

## 04

Address the serious inherent pro-police bias and unavoidable conflict of interest resulting from the symbiotic relationship between the District Attorney's ("DA") Office and the HPD.

DAs rely on police for assistance in successfully prosecuting cases. This relationship may cause DAs to avoid aggressive prosecution of the very officers on whom they are dependent. This issue can begin to be addressed by establishing an independent agency to prosecute cases of police abuse and misconduct, separate from the DA's Office.

## 05

Allow authorized IPOB members to report observations and results of investigations to the community (without revealing names of particular officers or victims of police abuse).

If the charge of the IPOB is to provide increased accountability and transparency to benefit the residents of Houston, then IPOB members should have a duty to share results, feedback, and recommendations with the public, including the Mayor and City Council.

## 06 Allow convicted felons (who have fully completed terms of punishment) to serve on the IPOB.

To represent the entirety of the Houston community, the IPOB should include members of the community who have had experience with police and the criminal justice system, including formerly incarcerated civilians and others who have had both positive and negative experiences with law enforcement.

## 07 Allow Green Card holders and Deferred Action for Childhood Arrivals ("DACA") recipients to serve on the IPOB.

Because input from the immigrant community is especially important in Houston, these residents would also aid in representing the entirety of the Houston community.

"Police cannot police themselves. Develop permanent, independent boards to review incidents of police corruption and brutality—and then fund them well and support them publicly. Only this can change a culture that has existed since the beginnings of the modern police department."

—TASK FORCE SURVEY RESPONDENT

## *DO ANY IMPROVEMENTS NEED TO BE MADE TO THE COMMUNITY COMPLAINT PROCESS?*

Yes. In order for the public to perceive police oversight as credible, the complaint process must be accessible, efficient, and transparent.

### 08 Allow community members to submit complaints online.

With respect to methods of filing a complaint, the more options available, the better. Currently, people can submit complaints in person at any police substation, at the Internal Affairs/Central Intake Office, or at community organizations. There is also a mail-in option, which requires notarization; however, no option currently exists for residents who wish to submit a complaint online.

### 09 Ensure community members can still submit complaints in-person at community organizations.

The HPD website states that residents can submit complaints at local community organizations, such as the National Association for the Advancement of Colored People ("NAACP") and League of United Latin American Citizens ("LULAC"). However, after speaking with current and former IPOB members and Houston residents, it appears those procedures have fallen into disuse. They should be re-implemented and advertised so that local community members are aware of their options.

### 10 Translate and accept complaint forms in multiple languages.

Houston residents speak over 145 languages, the third largest number of languages spoken in a US city behind New York (192) and Los Angeles (185).[23] Online forms can be dynamically translated as needed for residents who are more comfortable using a non-English language.

### 11 Communicate in a transparent and timely fashion with people who have filed a complaint.

A formal system should be implemented to confirm receipt of civilians' complaints. They should also be promptly informed of the result of their complaint and of any action taken upon conclusion of an investigation, to the extent consistent with legal constraints. A full-time staff who can serve as a personal point of contact for civilians going through the complaint process will help reinforce trust in the system.

## ***WHILE TIME IS TAKEN TO FIND FUNDING FOR SUCH A BOARD, WHAT CAN BE DONE IMMEDIATELY TO REFORM THE IPOB?***

In the next 90 days, the following changes should be made to the IPOB, in preparation for the independent investigative agency as described above:

### Take steps to ensure a balanced, fair culture

As Dr. Kristen Anderson (a former IPOB member) stated in her open letter to the public, "far too many Board members are uncritical boosters of the police and policing, sometimes shamelessly so, which hinders their ability to fairly evaluate officer conduct."

Additionally, IPOB members' recent support of the four HPD officers who shot Houston resident, Nicolas Chavez, 21 times confirms our belief that the IPOB's culture must be fundamentally overhauled. It is distressing to the Task Force that the civilians put in place to hold officers accountable would defend these officers' actions when even the Chief of Police himself said that he "cannot defend [the officers'] actions" and deemed their use of force "not objectively reasonable."[24]

**12** Replace the current IPOB chair and panel chairs. Institute staggered term limits to ensure fresh ideas.

The current IPOB chair and panel chairs are well-intentioned, dedicated, and hard-working, but are not optimally suited by background for their roles. And, in some cases, they have served too long in their roles to bring renewed perspectives. In order to dramatically transform the civilian oversight process—and to signal that transformation to the community—the current chairs should be replaced.

## 13

### Revamp the method for appointing IPOB members to allow community organizations to make recommendations, in addition to relying on City Council members.

Current IPOB member recruiting practices result in disproportionate pro-police predisposition and influence on the IPOB, the result of politically biased member appointments. The composition of the Board must be taken into account to achieve a more appropriate mixture of viewpoints. As recommended by the Boston Police Reform Task Force, "the Mayor should appoint its members from a pool of applicants recommended by civil rights advocacy groups, youth organizations, neighborhood organizations," faith organizations, and existing members.

## 14

### Do not include criminal or police records of individuals in the files turned over to the IPOB.

Too often, panel members justify or excuse abusive and unacceptable police conduct because the civilian had a criminal history ("This was a bad guy who deserved to be treated that way."). While human bias is to be expected, allowing those biases to influence decision-making results in unjustified exonerations, emboldening future police misconduct. Panels may request this information only if they believe it critical to make an informed decision.

## 15

### Train IPOB members when they first join and on an annual basis by a training entity unaffiliated with the HPD or another law enforcement entity.

IPOB members are supposed to receive training, but often do not. For those who did receive training, courses were led by the HPOU or another affiliated party. An independent training group should be evaluated and selected to train members both at the beginning of their terms and on an annual basis.

## Expand the existing workforce

Limited resources and staffing have curtailed the IPOB's ability to fulfill its current list of responsibilities, leaving the Board to focus only on reviewing completed IAD investigations.

### 16

### Create a Deputy Inspector General ("DIG") position with necessary support staff and facilities dedicated exclusively to matters relating to the HPD and IPOB.

This would include budget, waste and fraud, discrimination, and all other matters involving the HPD, including IPOB and civilian complaint issues. The DIG should far more proactively function as an "ombudsman for citizens with allegations of police misconduct and to assist, in a confidential manner, regarding the making or filing of a complaint against any HPD officer," as the EO and the City's website promise. The DIG should advocate fairly for members of the public complaining about police mistreatment and steer individuals' complaints through the investigative process.

### 17

### The IPOB should be expanded by ten members, creating two additional panels.

One new panel should focus on recruitment of new officers, training, and evaluations, as EO 1-5 provides (currently not being done). The second panel should be responsible for random reviews of body-worn camera ("BWC") footage (currently referred to as "BWC audits").

These duties could be rotated such that each of the six panels would be assigned both "recruitment, training, and evaluation" review duties and "BWC audit" duties throughout the year, while continuing to perform internal investigations reviews.

## Increase community awareness

Communities are ultimately the force for change, and it is only through the community's awareness and participation that we will achieve the promise of fair and transparent oversight.

### 18 The IPOB should develop and implement specific plans for extensive community outreach.

This community outreach plan should include, but is not limited to the following initiatives:

- Listen to and monitor community concerns on a regular, defined basis.
- Report community concerns to the Chief of Police, both formally (in writing) and verbally (in regular, periodic meetings with the Chief).
- Follow up with the HPD to assure due consideration is being given to the concerns of the community.
- Report back to the community on what is being done to address its concerns (with due regard to privacy concerns, confidentiality requirements, and constraints posed by ongoing legal proceedings).
- Inform the community on how to submit complaints about police misconduct.
- Raise the profile of the IPOB in the community.
- Function as a liaison between the community and the HPD.

### 19 Create an improved website for the IPOB.

The current website is difficult to navigate, making it hard for people to learn more about and engage with the IPOB.

## Establish regular contact with the Chief of Police, the Mayor, and City Council

As IPOB members are likely some of the most informed civilians on addressable patterns of behavior in policing, they should be in regular contact with those leaders most likely to affect change.

**20** The Chief of Police should establish a specific process to receive recommendations directly from the IPOB and should provide a prompt response to the IPOB panel concerning what action(s) has been or will be taken in response.

**21** Revisions to General Orders proposed by IPOB panels should be taken seriously, acknowledged by the Chief of Police, and acted upon promptly. The IPOB should receive timely notification of any action taken on such proposal(s).

**22** Submit quarterly reports to the Mayor and to the Public Safety and Homeland Security Committee of City Council.

These reports should outline systemic problems observed, recommend reforms to HPD practices and procedures, and suggest ways to continue to improve police-community relations. Each panel should submit a separate report.

## Implement process improvements

Common-sense improvements can be made to ensure the IPOB runs more smoothly.

### 23 Update the EO to allow IPOB panels 30 days to review assigned files.

Fourteen days is insufficient for five volunteer citizens with full-time jobs and other commitments to review multiple files thoroughly, meet to discuss the matter, and request additional information as needed.

### 24 Require an IAD officer to be immediately available during IPOB panel meetings to answer case-related questions.

Currently, if questions about the case arise, panel members must wait for a reply from IAD, potentially jeopardizing the fourteen-day time frame for case review.

### 25 Share responsibility for service on the Administrative Disciplinary Committee ("ADC").

The ADC is "an internal committee responsible for reviewing investigations containing sustained allegations and making a disciplinary recommendation to the Chief of Police." Instead of requiring only the chairs to serve on the ADC, panel members should share that responsibility on a rotating basis, with each member serving three months on the ADC per year. While this might deprive the ADC of some institutional consistency, it would reduce the time commitment demanded from those volunteers and diversify participation in the process.

## 26 Include autopsy reports in death cases.

Panels are frequently required to make determinations in death cases without seeing a copy of the autopsy report. Without access to autopsy reports in death cases, investigations remain inadequate.

## 27 IAD should make every effort to provide a balanced representation of the facts of the investigation.

Past IPOB members have shared that the recommendations from the IAD "feel like narratives or advocacy pieces written on behalf of and defending the police." Objective reports will help ensure a more balanced perspective that duly contemplates the actions of both sides.

## 28 Institute an annual audit of the IPOB to ensure compliance with policies and implementation of best practices as they arise.

Dr. Anderson's letter stated that certain responsibilities had not been fulfilled for all nine years she served on the IPOB. Waiting nine years to uncover unfulfilled responsibilities is unacceptable.

## 29 Update the EO to allow panels to conduct meetings virtually.

At least until the COVID-19 pandemic has subsided locally, IPOB panels should be authorized to conduct meetings virtually.

KEY TAKEAWAY

—

The Task Force urges the Mayor to fundamentally overhaul the current IPOB by switching from a monitor model with civilian volunteers to an independent, investigatory model with full-time, paid staff, reporting to the Mayor. We understand that finding funding for such a model may take time, so we have also recommended short-term changes that will help improve the fairness and accountability of the IPOB. To be clear, these recommendations are not "either/or." Simply executing the short-term wins will not satisfy the Task Force's call to action. Rather, the provided short-term recommendations lay a requisite foundation for our longer-term vision to succeed.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

SHORT TERM
WITHIN 90 DAYS
—

**03:** Policy on officer statements

**08:** Online complaints

**09:** In-person complaints

**10:** Multiple languages

**11:** Complaint response

Recommendations **12-29** (immediate reforms)

MEDIUM TERM
WITHIN 6-12 MONTHS
—

**01:** "180 day rule"

**02:** Timeframe for disciplinary action

**05:** Reporting to the community

LONG TERM
1 YEAR+
—

Fully enact a hybrid-model IPOB

**04:** DA conflict of interest

**06:** Convicted felons

**07:** Green card holders and DACA recipients

# POWER DYNAMICS

Balance the power dynamics between the HPD and Houstonians by releasing body-worn camera footage of critical incidents in a consistent and timely manner, further restricting the use of force, treating people with due respect, and committing to fundamental transparency by releasing audit and performance data on a regular basis.

## WHAT'S INCLUDED IN OUR DISCUSSION OF 'POWER DYNAMICS'?

The power imbalance inherent to the police-civilian relationship can threaten effective policing. Sustainable reform requires us to acknowledge the role that perceived power (and lack of power) plays in policing.

In this section, we will discuss four critical components to mitigating the effects of the power asymmetry that exists between the HPD and Houstonians.

Specifically, we focus our discussion on:

A. The use of **body-worn cameras ("BWC")** and the policies that guide video release
B. The HPD's **use of force** and the rules that govern police engagement with civilians
C. The role of **trust and transparency** in holding the HPD accountable
D. The core tenants of **respectful, equitable policing**

In each of the following sections, we will share the Task Force's recommendations for advancing the HPD's commitment to accountable, responsible, respectful, and transparent policing.

## A) Enacting body-worn camera video release policies

Consistent use of a body-worn camera ("BWC") in the field is only the first step. Withholding BWC video footage from the public after a critical incident does not fulfill the initial promise of transparency and accountability.

### WHAT IS A BWC AND WHY DO OFFICERS USE THEM?

A BWC is a small camera that can be clipped onto a police officer's uniform or worn as a headset and turned on to record video and audio of law enforcement encounters with the public. The video content is often saved with time and date stamps, as well as GPS coordinates. Though the technology has advanced over the years (e.g., some automatically turn on based on input triggers, some offer live-streaming capabilities), most BWCs—including the current ones used by the HPD—require officers to manually turn them on and off.

At the turn of the past decade, community stakeholders and criminal justice leaders called for law enforcement accountability and suggested the widespread use of BWCs on police officers. The aim was to improve relations between the community and law enforcement by ensuring accountability on both sides.[25] In response, many police departments started adopting BWC programs to improve the quality of policing in their communities and to alleviate the feelings of mistrust between the public and law enforcement.[26]

### TELL ME ABOUT BWCs IN HOUSTON.

The HPD began outfitting officers with BWCs in December 2013 when 100 cameras were purchased and distributed to officers in a pilot program.[27] Following the 2014 shooting of Michael Brown in Ferguson, MO, Houston Chief of Police Charles McClelland pushed for the department to be equipped with additional BWCs, with a planned deployment of 4,100 cameras over three consecutive years.[28] Chief McClelland and members of the community believed the technology could change the behavior of both officers and civilians, fostering more trust and accountability.

HPD's current BWC policy, General Order 400-28, has been publicly available on the department's website since August 2017.[29]

### ARE THERE EXISTING POLICIES DESCRIBING THE RELEASE STANDARDS FOR BWC VIDEOS?

34 states across the United States have BWC programs and policies[30] to regulate the use of the technology; however, they rarely specify policies for the public release of BWC video footage.

Only eight states and/or cities have a set time frame for the release of BWC video footage to the public once requested. Even when policies allow public access to BWC footage, videos are often only released at the police chief's discretion, as is the case with the HPD.

## *WHY SHOULD POLICE DEPARTMENTS RELEASE BWC VIDEOS?*

Releasing BWC footage can:

1. Show that the department is open and transparent to the public.
2. Increase public trust in the police department and its use of force investigations.
3. Help the public understand how and when force is used by the police, and what the department's policies do and do not permit officers to do.
4. Ensure that officers are held accountable if they use force inappropriately.
5. Provide more complete context, particularly if other videos (e.g., those from a cell phone camera) have been released publicly.
6. Correct any rumors or mis-perceptions that the public may have about what occurred.

## *IF BWC VIDEOS ARE SO IMPORTANT TO MAINTAINING TRANSPARENCY AND ACCOUNTABILITY, WHY DO DEPARTMENTS HESITATE TO RELEASE THE VIDEOS TO THE PUBLIC?*

Releasing BWC videos publicly may:

1. Make it more difficult for the department to investigate the incident. Witnesses may report what they see on the video instead of what they actually remember or be less likely to come forward if they think the video tells the whole story.
2. Cause distress to family members of either the officer or the civilian involved, particularly if the video is graphic and shared widely by mainstream or social media.
3. Bias potential jurors in a criminal case against the officer or civilian involved.
4. Create public confusion about what occurred, particularly if the video only captures part of the incident.
5. Violate the privacy of the individuals captured in the recording, particularly if the incident takes place in a private home. BWCs may capture footage of children, people in various stages of undress, and victims of domestic violence or sexual assault.

## *WHAT DOES THE TASK FORCE RECOMMEND REGARDING BWCs?*

We contend that the timely and certain public release of BWC footage is in the public's best interest. We recognize that the release of BWC footage is a difficult and complex decision. The arguments above prove that there is not a straightforward answer in all cases. However, we have reached a turning point in which accountability must be externally imposed on police. As the Justice Can't Wait report states, "Police having exclusive control over, and then refusing to release, video of killings which are disproportionately of Black men, defeats the purpose of having body cameras and does significant harm to trust and confidence in the Houston Police Department and their relations with the community." The HPD should:

**01**

### Implement clear and transparent dissemination timelines.

**24 hours:** In the event that a federal and/or state prosecuting authority opens an official investigation into a critical incident, the HPD should share all BWC footage with the prosecuting authority within 24 hours of the department being notified of the investigation.

**30 days:** In addition, the HPD should publicly release BWC footage of a critical incident, which includes display of excessive force and/or a death in custody, within 30 calendar days.

**Seven days/24 hours:** The HPD should notify the prosecuting authority seven calendar days prior to releasing BWC footage of a critical incident to the public, except when the Chief of Police determines that pressing circumstances require a shorter time period for release (e.g., in order to maintain public safety or preserve the peace). In such cases, notice should be provided to the prosecuting authority at a minimum of 24 hours prior to releasing BWC footage of a critical incident to the public.

**02** Consider additional BWC video release criteria.

- Release representative samples of the BWC video(s) depicting the critical incident, as well as any salient events leading up to the event.
- Maintain unedited footage of a critical incident and release it to an appropriate investigating authority upon request.
- Update the existing HPD BWC policy to explicitly prohibit footage tampering and prescribe a penalty for such acts.

**03** Share the BWC footage of a critical incident without redaction with the media and concerned parties (e.g., prosecution, lawyers, and family members).

The video(s) should also be made available on an accessible front-facing website designed to ensure transparency (taking into account restricting underage access and providing appropriate warning labels for graphic content).

**04** Protect certain privacy concerns when releasing the BWC footage, such as the interior of residences and other places where there is a reasonable expectation of privacy or the location of a domestic violence program.

## 05

Implement the following redaction standards when releasing BWC footage:

- Comply with federal, state, or local laws governing disclosure of records.
- Protect confidential sources and witnesses.
- Protect the identity of victims of sex crimes, domestic violence, and juveniles.
- Protect the privacy, life, or safety of any person.
- Avoid undue trauma due to explicit or graphic content by accompanying videos with appropriate caveats and warning labels.

## 06

Stipulate any delays in the release of BWC footage and provide public notice if delay is due to:

- Compliance with a court order or restraining order preventing release of such footage.
- Compliance with federal, state, or local laws governing disclosure of records or existing department procedures.

## ARE THERE OTHER LONGER-TERM INITIATIVES THE HPD SHOULD CONSIDER RELATED TO BWCs?

### 07

### Make clear the discipline required for an officer not turning on his or her BWC.

IPOB members have confirmed that there are cases that lack BWC footage, making it difficult to determine what happened, especially if there are conflicting accounts between the civilian and the officer. The Task Force acknowledges that there are situations in which the officer might forget to turn on his or her BWC, but repeated forgetfulness should not be tolerated.

### 08

### Upgrade the HPD's BWCs.

Forgetting to turn on or off a BWC can be avoided by using newer technology. Some BWCs offer real-time video streaming, while others offer Bluetooth trigger options for automatic recording. Agencies can select inputs that trigger BWCs to automatically turn on without manual activation. Triggers might include turning on a cruiser's lights or sirens, crash sensor activation when the car reaches a certain speed, or when nearby dashboard cameras or BWCs are switched on.[31]

### 09

### Invest in dashboard cameras ("dashcams") for all police cars.

According to findings by the Center for Justice Research at Texas Southern University, only 12% of HPD patrol cars have dashcams. A study by the International Association of Chiefs of Police ("IACP") reported that, similar to BWCs, in-car video systems resulted in greater professionalism by police and fewer complaints against them by members of the public. Dashcams provide additional evidence for civilians and reduce police department liability by providing real-time video footage. Additional dashcams may lead to a decrease in the number of civilian complaints and reduce the costs associated with investigating complaints.[32] More dashcams may also contribute to improved force performance and operating efficiency.[33]

"Body camera footage should be released immediately—that's public paid surveillance, the public has the right to see it. I respect police that serve and protect with dignity for human rights, but police should not be allowed to police themselves."

—TASK FORCE SURVEY RESPONDENT

## 10

Prohibit the use of facial recognition software with BWC footage.

In 2016, a Georgetown Law report found that nearly half of US adults' photos (48%) had been entered into some type of facial recognition network.[34] These networks use facial recognition software to analyze high-resolution images. Specifically, they use biometrics from BWC footage (or other footage or photos) to map out people's facial features. Then, they compare that information with other images in a database to find matches. Leading civil rights organizations oppose the use of facial recognition technology because they fear it will turn BWCs into a pervasive surveillance tool that will disproportionately impact communities of color. The software, in fact, generates a higher rate of false matches for people of color, especially women of color.[35] Due to discriminatory policing practices, Black people tend to be arrested at disproportionate rates and thus are overrepresented in database systems that rely on mug shot databases. Because of the potential for misuse and false positives, departments should not use facial recognition software to scan video footage.

## ***ARE THERE RESOURCES I CAN CHECK OUT TO LEARN MORE ABOUT BWCs AND VIDEO RELEASE POLICIES IN OTHER CITIES ACROSS THE UNITED STATES?***

Yes. Take a look at **Appendix C:** "Additional work on body-worn cameras ("BWC")."

## B) Limiting use of force

As the #8CantWait campaign demonstrates, research shows that more restrictive use of force policies can help reduce police killings and save lives. The HPD and the City have already taken some steps to update and outline guidance on use of force that addresses these and other reforms.

Today, the HPD:

- ☑ Prohibits chokeholds (EO 1-67)
- ☑ Requires de-escalation (EO 1-67)
- ☑ Requires officers to exhaust all alternatives before shooting (EO 1-67)
- ☑ Restricts when officers can shoot at moving vehicles (EO 1-67)
- ☑ Requires a duty to intercede (EO 1-67) and a duty to render aid (GO 600-18)
- ☑ Has a use of force continuum (GO 600-17)
- ☑ Requires comprehensive reporting (GO 600-17)
- ☑ Requires officers to give a verbal warning, when possible, before using deadly force (EO 1-67)

While these measures represent positive steps in the right direction, the department should add the following:

1. **Ban "no knock warrants" for non-violent offenses.** The existing EO still allows for "no knock warrants" as long as "the warrant has been approved in writing by the HPD Chief of Police or his designee ("Chief of Police") and the warrant has been signed by a district court judge." Those circumstances in which non-violent offenses have occurred should not justify the use of a "no-knock warrant" that could endanger the lives of both officers and civilians.[36]
2. **Update, consolidate, and make fully transparent HPD's de-escalation and use of force policies.** Three documents are referenced above including one Executive Order and at least two General Orders. The department should consolidate all input on de-escalation and use of force such that the policies are clear, comprehensive, concise, and easily accessible for public inspection.

## *WHAT ADDITIONAL CHANGES DOES THE TASK FORCE RECOMMEND REGARDING USE OF FORCE?*

### 11

### Place additional restrictions on when and how officers use force.

Far too often, deadly force is still used in situations where it is not truly needed. The killing of Nicolas Chavez at the hands of four HPD officers confirms this. Though officers initially spent fifteen minutes practicing de-escalation techniques, Mr. Chavez, who was suffering from an apparent mental break, was shot 21 times when he reached for a used Taser. By that point, he was sitting on the ground, having already been incapacitated by multiple Taser cartridges, bean bags, and three gunshots. Chief Acevedo confirmed that 28 officers were at the scene and that they had plenty of cover and distance when Mr. Chavez was reaching for the Taser.

To further reduce the unnecessary use of deadly force, Houston officials should adopt a version of the use of force standards as outlined by Dallas faith leaders, community organizers, and activists in their statement, *10 New Directions for Public Safety and Positive Community Change*.

The City of Houston's current EO states, "The use of deadly force by means of a firearm is limited to those circumstances in which an officer has an objectively reasonable belief that the use of deadly force is necessary to protect the officer or others from imminent serious bodily injury or death."

Given the above, absent extraordinary circumstances, the Task Force does not believe that the following situations would justify the use of deadly force:

1. if a suspect is unarmed;
2. if a suspect is running away or attempting to withdraw;
3. if a suspect is driving away or sitting in a parked car;
4. if a suspect is not armed with a firearm—for example, when a suspect is holding a knife, screwdriver, or blunt object; and
5. if the officer is alone – for example, after a solo foot chase.

*// Continued on next page*

// **11**, *continued*

In the event that deadly force is used, officers shall not shoot multiple times at a suspect without re-evaluating the necessity of additional deadly force.

One could argue that outlining the above scenarios is unnecessary because those instances should be logically covered by the "objectively reasonable" modifier in the EO. However, too many cases still exist in which an officer has used unnecessary deadly force under the guise of "imminent threat to serious bodily injury or death." Given the all too numerous unjustified uses of deadly force, the rules and expectations regarding the use of deadly force must be reassessed before the community can explicitly trust officers with their lives.

## 12

## Require officers to have at least 30 successfully completed hours in higher education, with a commitment to continue their education to at least 60 hours while serving in the department.

Studies show that while higher education carries "no influence over the probability of an arrest or search occurring in a police-suspect encounter," a college education "does significantly reduce the likelihood of force occurring."[37] The same study indicates that officers who have graduated from college are almost 40% less likely to use any form of force.

The Task Force acknowledges the potential for unintended consequences associated with imposing higher education requirements on incoming officers, including possibly negatively impacting minority or low-income applicants. However, the HPD already requires a college degree for promotion to the Commander level, offers financial incentives for earning a college degree, and reimburses officers who earn college credit or additional degrees (with appropriate stipulations). By continuing to encourage and support officers to reach desired education levels, the department can help reduce the overall likelihood of using force.

## 13

## Invest in an "Early Warning System" that tracks officer performance with the goal of preemptively identifying high-risk officers.

Several police departments have created computerized databases that track civilian complaints, use-of-force incidents, firearm discharges, resisting arrest reports, vehicular accidents, absenteeism, and any other criteria that may be an indication of "behavior problems in the making."[38] These systems help leadership with early intervention, through which they can proactively counsel, train, or mentor officers who may need extra attention.

## 14

## In particularly high crime areas, police officer patrol units should include two uniformed officers.

Though dependent on staffing, a partner patrol policing approach offers more security to officers, which in turn make officers less likely to be aggressive or use force. Additionally, a second officer can aid in assessing a situation and help de-escalate. Based on the duty to intercede policy, multiple officers are more likely to hold one another accountable and prevent an officer from using force without cause.

## Rebuilding trust through transparency

Transparency plays a pivotal role in keeping the HPD accountable and building community trust.

15

### Redesign the HPD website to be more accessible and user-friendly.

The current website is difficult to navigate and appears outdated. Many of the reforms discussed here suggest publishing data to the public on a regular basis. A redesigned website will allow civilians to more easily access data, policies, and other important forms or information.

When redesigning the website, Houstonians' input should be solicited through focus groups and user testing. Additionally, the website should reflect current best practices (e.g., adaptive design), comply with Americans with Disabilities Act ("ADA") guidelines, and be available in multiple languages.

16

### Publish an annual report to share HPD's diversity initiatives, practices, and statistics in all areas of policing such as recruitment, hiring, training, and promotion.

The HPD states that it is a "majority-minority" department and should therefore have no problem publicizing their detailed demographic information on a regular basis. At worst, disclosure of the information may indicate a need for improvement. At best, it may demonstrate progress or encourage the Houston community to get involved in making improvements.

## 17

## Publish disciplinary policies externally, and include an annual report recapping disciplinary action taken.

The HPD's disciplinary process should be transparent, not only to the internal department, but also to the broader public. The Houston community can gain confidence by seeing concrete, visible assurances that leadership applies consistent and appropriate discipline for officers' misconduct.

Human Rights Watch suggests: "Police departments should provide a report, respecting privacy concerns, describing at least the number of officers disciplined, the offenses leading to punishment, and the types of punishment, over a set time period. Such a report should also include the names and number of officers indicted or convicted during the reporting period, and the charges brought against them; this information should never be withheld."[39]

## 18

## Require performance-based audits of patrol and investigative functions, and publish the findings at regular intervals.

To create a checks-and-balances system and to maintain a culture of community-centered law enforcement, there needs to be an exhaustive, accessible, and frequently updated database of police encounters and audits. This pillar of transparency and accountability will continue to establish trust within the community, as well as legitimacy internally and externally for the department.

## 19

## Maintain a public database of complaints against officers, sustained and unsustained.

Release, and make easily accessible, police officer disciplinary records to include all sustained matters and consequences, along with the total number of complaints (sustained and unsustained). Including unsustained complaints can be a difficult task; however, if an officer has 100 complaints raised against him or her, and a typical officer with the same years of experience only has an average of two, that could warrant further investigation.

## 20

## Increase the level of detail on HPD's Annual Racial Profiling Reports.

HPD's current racial profiling reports cover the minimum amount of detail as established by the Texas Commission on Law Enforcement ("TCOLE"). However, only the number of traffic stops, reason for the traffic stop, and reason for the search are broken down by race.

The Houston Chronicle reported that "many researchers have concluded the best way to test racial bias is to examine what occurs after a stop, when police have no doubt of a driver's race."[40] The HPD should include the results of the traffic stop broken down by race, including: whether drugs or other evidence of illegal activity were found; whether a citation was issued or an arrest made; and whether the stop resulted in use of force.

"HPD needs to seek maximum transparency (cameras, relevant policies) in its actions and demonstrate that the force respects the life of the citizens it protects."

—TASK FORCE SURVEY RESPONDENT

## Promoting respectful, equitable policing

Many of the negative stories that we heard from our community survey respondents were about not being treated with respect by an HPD officer. Treating people with respect builds trust, encourages collaboration, and enhances relationships between the HPD and the community.

### 21

### Execute a zero-tolerance policy for use of derogatory, demeaning, or dehumanizing language directed toward civilians.

Use of explicit language when addressing, referring to, or giving orders to civilians should not be tolerated, overlooked, or ignored, as it creates a toxic divide between officers and civilians, and is poisonous to police-community relations.

### 22

### Adopt a 'customer service' approach to all aspects of policing with all civilians during traffic stops, complaint processes, and non-enforcement activities.

All civilians should be greeted and treated with respect. Officers should be reminded to clearly state their name, specific police station, and badge number (and/or hand out their business card), in addition to explaining what they are doing and why.

## 23 Ensure adoption of best practices for recruiting a diverse workforce, including but not limited to:

- Release information about recruitment events to various diverse stakeholders (e.g., local universities, particularly universities that have high enrollments of students of color, grassroot organizations, community centers, faith organizations, and houses of worship).
- Work with a recruitment team that reflects the diversity of the HPD's desired applicants, who are able to share their stories with potential recruits in a way that embraces diversity.
- Actively recruit citizens to join the HPD for the purpose of policing neighborhoods with which they have existing connections (i.e., from there, live there, or work there).
- Adopt and publish hiring criteria that reflect the desired qualities and values of officers (e.g., strong problem-solving and communication skills, bilingual language skills, a connection to the community).

Diversity amongst officers in a police agency and the interrelationships fostered by this diversity can help develop understanding, combat prejudices, and curb practices offensive to minority groups.[41] Additionally, individuals who are high in traits like emotional stability, empathy, and openness are more likely to adapt to working with community members who different from them.[42]

## 24 Adopt a bias-free policing policy.

In General Order 100-6, the HPD states, "All persons should be treated fairly and equitably." This short statement does not go nearly far enough in articulating HPD's commitment to protecting and serving the Houston community in a unbiased manner. Departments across the country, including San Francisco, Orlando, New Orleans, and Fort Worth, among others, have adopted specific policies entitled "Bias-Free Policing."

The HPD should create a policy that clearly states the commitment of the entire HPD (i.e., all sworn officers and civilian staff) to provide unbiased, high-quality service to every Houstonian. An excellent resource entitled "Bias-Free Policing" from the Law Enforcement Policy Center provides steps that local leaders can take to define, train, and implement this type of policy in their departments.

The HPD must define biased-free policing, and make it clear that the department does not consider specified or perceived personal characteristics (e.g., race, ethnic background, national origin, immigration status, gender identity and expression, sexual orientation, religion, socioeconomic status, age, ability, or political affiliation), except when credible intelligence links a person with those characteristics to "an accident, criminal pattern, or scheme."

## 25 Adopt model policies relating to police interactions with youths, including:

- A general policy related to youth interactions
- A policy related to juvenile arrests, booking and custody procedures (GO 500-06)
- A policy related to interviews and interrogation of youths
- A policy related to special populations of youths

Risk-taking is a natural part of youth development and identity formation. Most youth mature out of these tendencies. Youths differ from adults in three important ways that lead to differences in behavior:[43]

- Youth have less capacity for self-regulation in emotionally charged contexts.
- Youth have a heightened sensitivity to external influences, such as peer pressure, immediate incentives, and adult coercion; this heightened sensitivity may negatively impact a youth's ability to make decisions.
- Youth show less ability than adults to make judgments and decisions that demonstrate an understanding of consequences.

Adopting specific youth policies will demonstrate the HPD's commitment to equip its officers with developmentally appropriate, trauma-informed strategies for equitable responses to youth. Strategies for Youth, a non-profit organization that has worked with police departments across the nation to improve relationships between police and young people, has developed five model policies that HPD should consider.

## 26

The Task Force supports Mayor Turner's and HPD's proposal to implement a cite-and-release program for citation-eligible offenses (announced on September 17, 2020).[44]

The Task Force recommends including regular, transparent reporting to help monitor policy implementation, frequency of exceptions, and the reasons for those exceptions—including demographic information for individuals both cited and arrested.

As communities of color are disproportionately disadvantaged by arrests for offenses that are citation-eligible, the elimination of this unfair arrest policy is likely to decrease feelings of tension between those communities and law enforcement by reducing the fear associated with the possibility of unnecessary arrest.

"Talk to me with respect. Don't treat me like I'm a criminal. Don't use the N-word. Let me drive somewhere safe in the light to talk if you want to question me. Police officers need to be more understanding. Don't assume we are doing something wrong because of our clothes or the color of our skin."

—HOUSTON PEACE YOUTH SURVEY RESPONDENT

## 27 Improve fairness in Houston's municipal courts by requiring alternatives to jail time for people who can't afford to pay fines and fees.

Between June 2014 and March 2020, the HPD arrested more than 48,000 people for Class C Misdemeanor warrants, about 15% of the total arrests made during that period.[45] In 1983, a landmark Supreme Court case (*Bearden v. Georgia*) established that "punishing a person for his poverty" violates the equal protection clause of the Constitution; yet, the practice of arresting people for their failure to pay fines is still widespread. Studies have shown that an inability to afford the cost of court-imposed fines leads to the first arrest for many economically depressed people in the United States.[46]

The Justice Can't Wait report includes five excellent steps toward creating a more equitable policy, including:

- End the OmniBase Program, which prevents people from renewing their driver's licenses until they pay outstanding municipal court fines (for more information on the OmniBase Program, check out Texas Appleseed's *Driven By Debt* report).
- Impose fine amounts that are truly affordable.
- Waive fines and costs for people who cannot afford to pay them.
- Find alternative ways for people to resolve fines, such as a manageable number of community service hours.
- Ensure warrants are only issued for failure to appear after more than one attempt has been made to reach an individual.

KEY TAKEAWAY

—

A productive relationship between the HPD and the community requires a breakdown of power dynamics—increased transparency around policies and performance, and policing practices that both respect and protect the dignity of all Houstonians.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

SHORT TERM
WITHIN 90 DAYS
—

**01-06:** BWC release criteria
**07:** Discipline for misuse of BWC
**10:** Facial recognition software
**11:** Use of force policies
**14:** Two-officer patrols
**21:** Derogatory language
**22:** 'Customer service' approach
**23:** Diverse workforce
**24:** Bias-free policing policy
**25:** Model policies for youths
**26:** Cite-and-release reporting
**27:** Jail time alternatives

*Additional:*

Ban no-knock warrants for non-violent offenses

MEDIUM TERM
WITHIN 6-12 MONTHS
—

**15:** HPD website
**16:** Diversity annual report
**17:** Disciplinary policies
**18:** Performance audits
**19:** Public complaint database
**20:** Racial profiling reports

*Additional:*

Consolidate use of force policies

LONG TERM
1 YEAR+
—

**08:** Upgrade BWCs
**09:** Dashcams
**12:** Educational requirement
**13:** Early warning system