# CRISIS INTERVENTION

Expand existing partnerships between the HPD, mental health professionals, and social services organizations to lighten the load on officers when responding to vulnerable populations, such as those experiencing mental health crises, domestic violence, human trafficking, substance abuse, and homelessness.

## WHY IS CRISIS INTERVENTION IMPORTANT TO TALK ABOUT?

The City of Houston already has in place a strong model for crisis intervention. By expanding the City's and the HPD's existing partnerships, our police officers will be able to focus more on their role as guardians, while our civilians will receive more of the support they need from trained social services providers.

Our conversation on partnerships will center on the HPD's working relationship with partners in crisis intervention. Specifically, we focus on programs for crisis intervention, which support officers in navigating crisis calls that may involve mental health needs.

In this section, we will explore and evaluate Houston's existing partnerships and programs aimed at crisis intervention.

The Task Force will also share recommendations for expanding those partnerships to promote right-fit care for our community's most vulnerable populations.

## ***WHAT IS CRISIS INTERVENTION TRAINING?***

The primary goal of crisis intervention training ("CIT") is to provide law enforcement officers with the tools to respond effectively to situations involving a person with mental illness in crisis and, when appropriate, refer them to mental health services rather than incarceration. The CIT model varies widely from jurisdiction to jurisdiction based on local need, resources, and collaboration.

## ***WHAT DOES THE CIT MODEL LOOK LIKE IN HOUSTON?***

In 2019, the Mental Health Division of the HPD consisted of 40 full-time personnel. The HPD's model includes training and response. The CIT Unit trains more than 5,600 law enforcement personnel annually.

In addition to CIT-trained officers, the HPD maintains twelve Crisis Intervention Response Teams ("CIRT"). Houston has one of the largest single police department co-responder programs in the nation, through which an officer and clinician ride together as partners. The CIRT program can be thought of as a specific subset—a unique strategy existing alongside CIT-trained officers. A CIRT team pairs a licensed, masters-level mental health clinician from The Harris Center with a law enforcement partner. The philosophy of the program is to 1) promptly and accurately assess and treat individuals experiencing a mental health crisis to avoid unnecessary incarceration, and to 2) utilize the least restrictive means of stabilizing people, including linkage into outpatient services where indicated.

The mobile CIRT teams respond to 911 dispatch calls and referrals from the HPD Mental Health Division, the Harris County Sheriff's Office Mental Health Unit, and The Harris Center for Mental Health and IDD. The law enforcement officer researches the individual's criminal history and provides safety by securing the scene. The licensed, masters-level clinician accesses medical records to research the individual's mental health history en route to the crisis.

Once on the scene, the clinician will provide a mental health assessment, determine the appropriate level of care (e.g., is hospitalization indicated?), offer linkage/referral to services, and educate on-scene family members or other concerned parties. Clinicians also act as consultants to law enforcement and assist with obtaining inpatient hospital beds. Law enforcement may provide transportation to an inpatient facility for individuals in severe crisis. CIRT also completes follow-ups at the request of the referral source.

In October 2011, a joint Harris County Sheriff's Office ("HCSO") / HPD CIRT was formed that serves the entire Houston/Harris County region. The interlocal agreement was approved by both the Harris County Commissioner's Court and the Houston City Council, and it allowed the HCSO to join with the HPD and The Harris Center for Mental Health and IDD's CIRT program.

## HOW DOES HOUSTON'S MODEL COMPARE TO NATIONAL STANDARDS?

While there has not been enough research to date to declare CIT an "Evidence Based" practice, CIT has been called both a "Promising Practice" (International Association of Chiefs of Police, 2010) and a "Best Practice" model for law enforcement.[47] One of the core elements of the model is collaboration with community partners, including mental health providers.[48]

The US Department of Justice's Bureau of Justice Assistance supports ten urban and rural police departments to act as host sites to visiting law enforcement agencies and their mental health partners. The HPD is one of the technical assistance sites for crisis intervention training, thus serving as a leader in training other departments across the country.

The US Substance Abuse and Mental Health Services Administration ("SAMHSA") has identified standards for CIT.[49] When comparing the HPD's CIRT model to the standard, CIRT operates with and above adherence to SAMHSA best practice standards (see **Appendix D:** "Comparison of the HPD's CIRT model to national standards").

## HOW DO 911 CALLS REACH CIRT?

All calls come from the dispatcher via the Houston Emergency Center ("HEC"). 911 call-takers answer the phone lines when a civilian calls to report an emergency for police or fire response. The call takers follow a logic tree of questions based on the nature of the complaint. The call taker will generate a call slip summary with a specific title accompanied by a four-digit numerical code that best matches the nature of the call (e.g., "3041 Disturbance/CIT") and assign a response priority that ranges from Code One to Code Seven (Code One being the highest priority). The call slip will contain a brief narrative of the complaint with limited details of involved persons and a possible phone number.

Once the calls slips are created, they are sent to a queue on the dispatch board broken down by patrol district boundaries (i.e., geographic areas of the city divided into 22 patrol districts). The dispatcher will broadcast the call for service to the patrol officers via police radio and the next available unit will either volunteer or be dispatched to respond to the call for service.

CIRT does not adhere to any one specific district and beat. CIRT operates countywide and will be called upon by the request of any patrol unit or any district dispatcher. Both the CIRT officer and clinician can see the call slip details and run the consumer's name (if provided by the reporter) in the clinical database for any potential documented history of public mental health treatment. Oftentimes, the clinician and officer will be able to know the history of their mental health prior to their arrival (time permitting).

The HEC receives approximately one million calls for service for the HPD annually. Within their line of questions, the 911 call-takers ask a series of basic questions related to mental health (i.e., does this involve someone with mental illness or someone in a mental health crisis?). If there is a link or component to mental health, the call-taker will label the call with one of the 28 types of CIT codes. Last year 40,500 calls were so labeled.

## *WERE ALL 40,500 CIT-CODED CALLS HANDLED BY CIRT?*

No. CIRT Teams are dispatched as secondary (back-up) units to CIT calls. First line patrol units assigned to their respective districts and beats are dispatched as primary units to respond to CIT calls due to their closer proximity. The travel time for CIRT to respond to the call from dispatch time to arrival time can average twenty minutes depending on their current location throughout the entire city. CIT calls can be volatile, fluid, and unpredictable in required time per call. Any delay in responding could be detrimental to the safety of those involved at the scene as situations could deteriorate. If CIRT workers are tied up on calls, any other CIT-type calls will be sent to the dispatch board in queue awaiting a unit to be dispatched.

## *WERE ALL 40,500 CIT-CODED CALLS AT LEAST HANDLED BY CIT-TRAINED OFFICERS?*

No. Last year, 72% of the HPD CIT calls were dispatched to CIT-trained officers. All new HPD officers receive Crisis Intervention Training, including training in mental health and de-escalation techniques, at the Police Academy. Gradually, the proportion of CIT-trained officers will continue to increase as new officers come onto the force.

## *WHAT ARE THE OUTCOMES OF CIRT RESPONSES?*

The primary goal of the CIRT program is to resolve mental health related calls to law enforcement which have no apparent criminal nexus and some potential risk of violence by responding to the mental health needs of the individual in crisis.

The dramatic success of this approach is illustrated in the table below. Dispositions of 25,227 calls recorded since 2014 are presented in Figure 2. The program's success in diverting individuals in mental health crisis away from the criminal justice system is evident in the rate (4.1%) of calls leading to incarcerations. Fewer than one in twenty individuals are transported to jail.

Successful crisis resolution is reflected in the proportion of calls resolved on the scene. About one in four crises (24.9%) are brought to immediate resolution with intervention by CIRT team staff. About 70% of calls are resolved by transport to crisis or emergency services. The Harris Center's 24/7 Psychiatric Emergency Service ("PES") located at the Neuropsychiatric Center ("NPC") in the Texas Medical Center receives more than one third of clients (34.4%) encountered by CIRT.

A slightly larger number (36.4%) have been transported to 38 area hospital emergency departments when the NPC/PES was at capacity and could no longer accept psychiatric crisis cases (see Figure 3). Of the calls resulting in hospital admission, most are involuntary (94%) and require Emergency Detention Orders ("EDO").

**Fig 2.** Dispositions of 25,227 diversion calls (since 2014)




**Fig 3.** Ten most frequent hospital destinations from diversion calls

**The hospitals included below represent 6,880 (27.2%) of the 25,227 total diversion calls. Percentages listed represent the percent of total dispositions for each destination hospital.**



## HOW MANY CIVILIANS ARE SERVED BY CIRT?

Since its inception in May 2008, CIRT has completed 35,708 calls to 21,083 unique individuals. These numbers only include events in which face-to-face connection with the caller was completed, which represent 75% of total calls referred to CIRT.

The program has increased its capacity in virtually every year since 2008. The growth of the program's productivity is presented in the graph below. Numbers for the current year (2020) have been annualized (extrapolated from year-to-date). Most frequently (72.6%), individuals served by the program are encountered only once. The range, however, extends to 34 encounters.

**Fig 4.** Total CIRT calls per year, 2008-2020*

*Numbers for the current year (2020) have been annualized based on year-to-date data.



## WHO DOES CIRT TYPICALLY SERVE?

The clients served were predominantly male (58.5%) vs. female (41.3%). The average age of participants was 36.4 years. Ninety percent were adults and ten percent were youth under 18 years old. The vast majority (94.8%) spoke English as their primary language. The major ethnic group categories were represented as follows: 43.7% African American, 34.3% Anglo, 18.83% Hispanic, 2.3% Asian American, and 0.8% "Other."

**Fig 5.** CIRT clients, by major ethnicity, April 2014 to August 2020




The modal (most frequently observed) participant had never married (62.8%), had completed 12 grades of education (22.2%), lived in their family home (62.8%), although 12.2% reported homelessness, and viewed themselves as outside the labor force (33.2%). Most (89.9%) reported incomes below the Federal Poverty Level. The mean annual income was $6,228. Almost half (43.5%) were medically uninsured. A slightly larger number (46.5%) had federally funded health insurance (Medicaid, Medicare or CHIPS).

## ***WHAT WERE THE COMMON DIAGNOSES?***

The majority of diagnoses reflected serious mental illnesses, including Bipolar Disorders (29.8%), Schizophrenia Spectrum Disorders (27.3%), and Major Depressive Disorders (17.0%). The remaining 24.3% suffered other disorders. Notably, 34.6% of participants were diagnosed with secondary substance use disorders.

Individuals served by CIRT are assessed using a standardized instrument widely adopted for mental health treatment planning and outcome evaluation, the Adult Needs and Strengths Assessment ("ANSA"). The brief crisis version is best suited to CIRT use. The graph below shows the percentage of the 22,336 assessments in which specific problem areas were rated as severe. One can observe that suicidality is the most prominent problem area, accounting for the three peak elevations. Danger to others and substance abuse issues are also frequent severe problem areas.

**Fig 6.** Percent of 22,336 ANSA-evaluated adults who received a "severe" rating



Similar results for 2,288 children and adolescents served by CIRT are presented below. Youth served by the program had often been treated in psychiatric hospital and emergency services prior to the encounter. Suicide risk and danger to others were the most frequent problem areas.

**Fig 7.** Percent of CANS-tested children who received a "severe" rating



## *WHAT IMPACT DID CIRT HAVE ON THE USE OF THE HARRIS COUNTY PSYCHIATRIC CENTER ("HCPC")?*

We evaluated data to determine if CIRT intervention had a longer-term impact on use of the county's public psychiatric hospital, HCPC. As has been observed in evaluation of intensive case management services, reductions in hospital admissions may take more than one year to accrue. It is as though the individual requires a year of intensive services before sustained improvement occurs. One can observe that the annual rate of admission increases by 1.7% in the first year of CIRT intervention, followed by sharp reductions occurring in Year 2 and Year 3. Lacking a comparison group, one can conclude that these reductions may be due to intervention, but may also represent regression to the mean or the natural course of crises in a client's lifetime. While longer-term benefits such as reduced use of public psychiatric hospitals are not the primary goal of this crisis program, it appears that these benefits may occur over a two- or three-year span.

**Fig 8.** Impact of CIRT intervention on admittance to the public psychiatric hospital



## ***WHAT IMPACT DOES CIRT HAVE ON SUBSEQUENT CIT CALLS?***

The question of whether CIRT intervention is associated with reductions in subsequent CIT calls can be answered in two ways. First, we observed that CIT calls actually increase from 0.13 calls per person during the year prior to the first CIRT call to 0.38 calls. This is a statistically significant increase. However, when CIRT clients are followed to the present date (average = 5.54 years since intervention), we observe significant decreases in annualized rates. The decrease from 0.88 annualized CIT calls per person to .08 annualized calls per person is noteworthy. One is reassured that a statistical test of the change is significant ($P < 0.001$) though the effect size is small (partial eta squared = 0.004). One can conclude that there is a decrease in CIT calls following CIRT intervention, but that the decrease occurs over more than a one-year span.

## ***ARE THERE OTHER PROGRAMS WITHIN THE HPD'S MENTAL HEALTH DIVISION THAT SERVE PEOPLE WITH MENTAL HEALTH ISSUES?***

Yes. Look at **Appendix E:** "Other law enforcement collaborations with the HPD Mental Health Division" for a full list. One noteworthy program is Crisis Call Diversion ("CCD"), a partnership between the City of Houston, the HPD, The Harris Center, and the Houston Fire Department. Mental health professionals are embedded at the 911 call center for the City of Houston. If the 911 call is labeled with one of the 28 types of CIT call codes, then a mental health professional will take the call.

Originally, only calls without a criminal nexus and without threats of violence could be directly sent to the CCD terminal for their handling. Since February 2020, some calls which are clearly mental health-related and also have a low-level criminal component may also be referred.

A successful diversion involves CCD resolving the situation over the phone with the concerned party, without needing a police or fire response. Some common responses to these calls include transfers to The Harris Center's crisis line, non-law enforcement mobile crisis response, community referrals, and development of suicide reduction "safety plans."

CCD may find during the course of the phone conversation that police intervention is still needed. The need may be due to the request of the caller or crisis escalation, necessitating an emergency response. The CCD counselor will send a message to the dispatcher advising them this call needs to be routed to police for their handling. After consultation with the caller and an intervention or referral to mental health services, CCD calls are returned to the Emergency Call Center queue so that law enforcement representatives can determine if further intervention is required.

## *HOW MANY 911 CALLS DOES CCD RESOLVE?*

In fiscal year 2019, CCD successfully resolved 2,300 calls which, as a result, no longer required intervention from law enforcement.

The HPD reported that CCD-screened calls use less officer time than other CIT calls. Officers responding to CIT calls generally logged 123 minutes per call. In contrast, CCD-screened calls require only 36 minutes of officer time. Their data indicated that, on average, each CCD call saved 87 minutes.

## *WHAT ARE THE TASK FORCE'S CONCLUSIONS REGARDING THE HPD'S CIRT AND CCD PROGRAMS?*

The use of CIRT Teams is effective in meeting the primary goal of diverting mental health crises from jails and from unnecessary use of law enforcement personnel. The data reported above support the conclusions that:

1. CIRT operates with and above adherence to SAMHSA best practice standards.
2. Call triage effectively sorts requests into CIT codes and dispatches personnel appropriately to CIT-coded events. Calls diverted to CIRT do indeed have a mental health basis.
3. The high rate of CIRT diversion from jails (95.9%) indicates that the primary program goal is attained on a regular basis. Individuals, typically those with serious mental illness, are diverted from jails, reducing the criminalization of mental illness.
4. The ability to resolve calls on scene (24.9%) reflects the value added by trained, experienced mental health professionals who have demonstrated competence in de-escalation strategies.
5. Linkages to crisis services and emergency departments connect people in crisis with services intended to reduce danger to self and others.
6. CCD services dramatically reduce officer time for CIT calls.
7. Diversions initiate or enhance engagement with the mental health system which may produce longer-term benefits for both the individual and the public.

"I wish there was a more publicized crisis response intervention team [to] direct people towards treatment... without involving the criminal justice system.

The key here is not just to have these teams, but also to ensure that the public knows about them."

—TASK FORCE SURVEY RESPONDENT

## ***DOES THE TASK FORCE HAVE ANY RECOMMENDATIONS FOR IMPROVEMENT?***

**01**

Expand the CCD program by: extending coverage by mental health counselors to 24/7, increasing the number of counselors in the program to handle more calls, and expanding the type of calls that the mental health counselors can answer, as appropriate.

Diversion of mental-health-related 911 calls at the call center level is the earliest point of diversion before any law enforcement involvement. Since the beginning of the program, CCD diverted more than 4,902 calls from law enforcement response and saved the equivalent of 7,353 hours of police time (March 2016 - May 2019). However, The Harris Center's current coverage of these mental health-related 911 calls is not 24/7.

The estimated cost for additional staff to provide 24/7 coverage and take on additional calls is $272,140. The recommendation is consistent with The National Guidelines for Crisis Care essential elements within a no wrong-door integrated crisis system, which includes a 24/7 clinically staffed hub/crisis call center that provides crisis intervention capabilities.[50]

## 02

## Increase the number of Mobile Crisis Outreach Teams by eighteen teams and re-brand the model to receive referrals directly from 911 call takers in HEC via police band radios.

A Mobile Crisis Outreach Team ("MCOT") is a team of mental health professionals that responds to situations involving a person in mental health crisis without the involvement of law enforcement. MCOT has a proven track record of handling situations involving mental health crises with appropriate community resources. Law enforcement is rarely needed. MCOT handles around 200 calls per month and can be dispatched from the CCD or The Harris Center's crisis line. Additional staff could handle increased demand associated with the 40,000+ 911 mental health calls currently received. The estimated cost of this recommendation is $4.3 million and would include eighteen new MCOT teams.

This recommendation is consistent with the National Guidelines for Crisis Care, which establishes essential elements within a no wrong-door integrated crisis system including mobile crisis teams available to reach any person in the service area in his or her home, workplace, or any other community-based location of the individual in crisis in a timely manner.[51]

## 03

## Increase the number of CIRT teams by 24 new teams.

The role of local law enforcement in situations involving emergent public safety risk is essential. The collaboration and partnership between a law enforcement officer and a mental health clinician improves both public safety and mental health outcomes and is considered a core principle in best practice crisis care.[52] The HPD currently has 12 CIRT teams. Between May 2019 and May 2020, HPD CIRT responded to more than 4,600 calls. An increased number of CIRT teams could respond to more mental health-related calls. The estimated cost of this recommendation is $8.7 million for 24 new CIRT teams, including staff, vehicles, and equipment.

## 04

## Implement the Clinician-Officer Remote Evaluation ("CORE") program to provide telehealth technology to 80 HPD CIT-trained officers in patrol.

The Clinician-Officer Remote Evaluation Program ("CORE") is a telehealth strategy for responding to mental health crisis calls using a tablet and a HIPAA-approved technology platform to connect a law enforcement first responder with a mental health clinician in the community at the time of the 911 dispatch. CORE provides an additional resource to law enforcement to handle calls involving a person with mental illness. The officers would have the capacity to access licensed clinicians at The Harris Center to assist with a mental health assessment on the scene via electronic technology. CORE also maximizes the mental health workforce. The Harris County Sheriff's Office has already implemented the CORE program. The estimated cost of providing CORE services to 80 HPD officers is $847,875, which includes technology and clinical staff.

The University of Houston has evaluated the Harris County Sheriff's Office's pilot of CORE, leading Harris County to expand the pilot into a permanent program.

## 05

## Amend the Texas state law (Chapter 573 of Texas Health and Safety Code) related to Emergency Detention Orders to allow a physician and/or other health care professionals to execute a Notification of Detention, reducing law enforcement's involvement.

The Legislature simplified the Notification of Detention paperwork (Texas Health and Safety Code Section 573.002) related to Emergency Detention Orders ("EDO") for law enforcement. Only a law enforcement officer can authorize a Notification of Detention. The HPD executed 12,000 Notifications of Detention related to EDOs in 2019.

*Continued on next page*

*// 5, continued*

Authorizing a physician and/or other health care professionals to execute Notifications of Detention would reduce law enforcement's role in this process involving persons in mental health crises. The Legislature must pass a new law to make this change. Political hurdles exist, as similar legislation has been introduced and did not pass. If the Legislature passes a bill to make this change, implementation could begin at the bill's effective date, which would likely be September 1, 2021.

Though the previous recommendations focus on aiding civilians with mental health services needs, the Task Force recommends two additional initiatives to help support other vulnerable populations: victims of domestic violence and victims of human trafficking and/or sexual exploitation.

## 06

## Permanently fund a citywide Domestic Abuse Response Team ("DART") model that pairs police officers with a victim advocate and a forensic nurse examiner.

DART is a mobile intervention model for high-risk domestic violence victims that ensures victim safety, facilitates enhanced offender accountability, and builds victim trust in the criminal justice system. Domestic abuse scenes can often be violent and unpredictable. The partnership is a multi-disciplinary approach that attends to victim safety and allows for on-site evidence collection. The HPD officer handles safety and security so that the advocate and nurse can safely interact with and aid the victim. Partnerships with local community-based domestic violence agencies ensure that high-risk victims immediately connect to resources that ultimately save lives by providing emergency shelter and long-term care options for victims.

DART began as pilot program in January 2019. They currently operate three nights a week for eight hours (7pm – 3am) on the weekends in Northeast, North Belt, and North Patrol. Investment in a citywide effort could expand the hours that DART operates to serve more Houstonians in need.

"I work as a forensic nurse examiner specializing in sexual assault... I believe that police officers may not always be what survivors need. Patrol cops responding to calls of this nature are missing the mark on what sexual assault survivors need when they call for help."

—TASK FORCE SURVEY RESPONDENT

## 07

## Decriminalize people in prostitution while continuing to prosecute pimps, brothel and illicit massage parlor owners and managers, sex tourism operators, and sex buyers.

The arrest of those who sell sex does not effectively address the violent and discriminatory system in which sex workers often find themselves. The disproportionate focus on arresting those selling sex—often women who are low-income, many of whom are coerced—rather than buyers, pimps, or brothel owners is deeply troubling. A trauma-informed, victim-centered approach is needed. Similar to the DART or CIRT programs, this program would include a pre-diversion program or drop-off center in partnership with community-based organizations so that law enforcement can focus on arresting the traffickers and buyers, not the sex workers or those that are being trafficked. Law enforcement is arresting the wrong people for these actions, and we suspect it is disproportionately impacting women of color.

Victims of sexual violence rarely get justice because the focus tends to be on their credibility rather than on the actions of the offender. In cases of trafficking, this dynamic is compounded by having the human trafficking department located in the Vice Division rather than in a victim services or a sex crimes unit. Finally, training for officers on human trafficking, sex trafficking, and the dynamics of sexual assault need to be examined and potentially expanded.

KEY TAKEAWAY

—

By expanding partnerships with mental health and social services providers, the HPD can not only better serve its officers by refocusing their day-to-day, but also better serve its community by offering right-size care for all.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

| SHORT TERM<br>WITHIN 90 DAYS | MEDIUM TERM<br>WITHIN 6-12 MONTHS | LONG TERM<br>1 YEAR+ |
| --- | --- | --- |
| **01:** CCD expansion | **02:** MCOT expansion | **03:** CIRT team expansion |
| | **04:** CORE program | **07:** Decriminalization |
| | **05:** Texas EDO law amendment | |
| | **06:** DART funding | |

# FIELD READINESS

Equip and prepare officers for better engagement in the field through initiatives like reviewing and updating officer training, expanding mental health and wellness programs for officers, and instituting a mentorship program.

## WHAT DETERMINES FIELD READINESS?

Cadet training is integral to preparing officers for their time in the field. However, initial training at the Academy is only one tool that the HPD provides to its officers. Recurring training, support for officers' mental health and wellbeing, and commitment from leadership to listen and adjust to officers' needs are critical, too.

In this section, we will discuss:

A. The effectiveness of **officer training** within and beyond the classroom

B. The importance of **officer health and wellness** in promoting more sustainable readiness

C. The need for **additional support initiatives** to streamline in-field operations

## A) Promoting effective officer training

Views on officer training tend to fluctuate based on current circumstances; for example, when things go well, the public tends to be satisfied with officer training, but when things go poorly, the public tends to point to a lack of training as a significant problem. To ensure officer field readiness at all times, the HPD should approach training with the mindset of continuous improvement, adapting to the changing needs of officers, the public, and ongoing best practices.

### *WHAT TRAINING DO INCOMING CADETS RECEIVE?*

Prospective cadets enter the HPD's Training Academy and receive six months of academic and physical training. Each class begins with approximately 75 cadets. Cadets receive 696 hours of Texas Commission on Law Enforcement ("TCOLE") Mandated Instruction (including 40 hours of Crisis Intervention Training ("CIT")). The HPD expands on this minimum level of training by providing 972.5 hours of Basic Police Officer Class ("BPOC") content, 104 hours of additional HPD instruction, and 28.5 Testing Hours, totaling 1,105 hours of additional instruction during the six-month training program. Additionally, the HPD administers approximately 87 hours of classroom instruction on defensive tactics training, which does not include their one-hour physical fitness sessions three days a week, totaling around 72 hours..

The cadets are tested on and required to pass nine academic primaries, four quizzes, a grammar quiz, and a Spanish test. Additionally, they are graded on their firearms and driving performance.

### *WHO ADMINISTERS THE TRAINING?*

There are approximately 374 trainers eligible to teach classes for the HPD. Trainers either initiate a lesson plan or they are requested to teach a course by the department. The majority of the trainers are employed with the department, though there are additional trainers employed with other agencies and/or companies (e.g., Federal Bureau of Investigation, Department of Homeland Security, Anti-Defamation League). As mentioned above, all incoming cadets receive 40 hours of CIT instruction, which is taught by HPD Mental Health Division officers. Other courses taught by mental health professionals include: Psychology of Policing One & Two, Situational Awareness, Beyond Trauma, and Traumatic Brain Injury.

All instructors have either completed the TCOLE 40 Hours Basic Instructor Course and/or have training experience. Trainers are normally selected because of their expertise in the subject matter.

## DO EXISTING OFFICERS RECEIVE OPPORTUNITIES FOR ADDITIONAL TRAINING ON AN ANNUAL BASIS?

Yes. HPD classified personnel are required to take 32 total hours each HPD Training Cycle (September 1 through August 31). Classes are offered primarily in person. Where appropriate, scenario-based training ("SBT") exercises are incorporated. In addition, officers have been required to take other mandatory classes and a number of electives so that they fulfill their yearly training requirement. CIT-trained officers receive an additional eight hours of "Advanced CIT" training per year.

Approximately 92% of HPD officers exceeded the required 32 hours of training during the last training cycle.

## DO OFFICERS NEED MORE TRAINING?

Training is not the final answer for solving problems and cannot be said to be the perfect (or even sometimes the best) answer for addressing problems. For example, the Minneapolis Police Department implemented progressive police reform interventions, including offering implicit bias training, mindfulness, de-escalation techniques, and training for mental health crisis intervention. Despite these interventions, George Floyd was killed. Additionally, it can be difficult to find research or data that supports training effectiveness in certain areas, as many factors beyond training can impact an officer's in-field performance.[53]

That said, many people—officers included—support opportunities for additional training. When officers are in the field, they rely on a mixture of instinct, training and experience, and we certainly want to ensure training impacts their decisions and behavior as much as possible. While we recognize the need for balance between time spent in training and time spent in the field, there are steps the HPD can take to re-evaluate and improve existing training to better serve the Houston community.

## ***WHAT RECOMMENDATIONS DOES THE TASK FORCE HAVE FOR HPD TRAINING?***

**01**

### Increase the amount and type of de-escalation training in the Academy, and include retraining at regular intervals.

Current cadet training includes eight hours of de-escalation training as required by TCOLE. While additional components of de-escalation may naturally arise through other training modules, we recommend expanding de-escalation training by examining updated best practices and including more opportunities for skill development such as mediation, problem-solving, communication, and other relevant content areas (e.g., sociology and conflict resolution). Training that encourages slower decision-making, greater transparency, and more communication can help reduce the misuse of force.[54]

We recommend scenario-based training ("SBT") that will allow officers to demonstrate their ability to communicate, listen, and de-escalate in realistic situations. Consideration should be given to how students are evaluated and, if needed for an individual, further training should be provided. A key component for the success of this training depends on proper vetting during the hiring process of officers, as well as the selection of instructors.

While there is room for additional research on the effectiveness of various training methods,[55] de-escalation training has been shown to affect civilian attitudes and perceptions of law enforcement, which is meaningful, even as some suggest a lack of evidence of the training's impact on behavior.

To further promote positive change, we recommend validating that the HPD's use of force and de-escalation policies are aligned with the training lesson plans. In addition, it is critical to ensure that updated lesson plans are followed by all instructors. The success of these changes could be measured by fewer violent or physical confrontations and a more positive attitude toward and perception of the police.

## 02 Review and update the department's implicit bias and racial equity trainings, and include retraining at regular intervals.

The HPD offers four classes on "Multiculturalism and Human Relations" for incoming cadets, including Multiculturalism / Diversity Neighborhood Tour (eight hours), Multiculturalism / Human Relations Classroom (two hours), Multiculturalism Panel Discussion (four hours) and Situational Bias (one and a half hours). Additionally, cadets receive four hours of Racial Profiling, as mandated by TCOLE.

This training is arguably a step in the right direction but has a couple of major drawbacks. First, a neighborhood tour and a panel discussion cannot be considered in-depth enough to generate true cultural understanding and community connectedness (see Recommendation 01 in the "Community Policing" section). Additionally, this training module only includes one and a half hours of situational bias training, which is not enough time to effectively allow officers to understand, confront, and manage their own implicit biases.

New programming should be built out and expanded and everyone—all recruits, sworn officers, and civilian employees—should participate. In addition to expanding the implicit bias training (led by implicit bias trainers who specialize in working with law enforcement), this program must promote racial equity and literacy and have an anti-racist orientation. Training should allow for skill development over longer durations, rather than a one-off training session.

Any new training approaches that are deemed useful starting points should be tested and documented by the HPD. Having better data that shows proven results in reducing bias within the HPD will help to ensure that only evidence-based practices are continued. The Task Force acknowledges that assessing the efficacy of implicit bias and racial equity training is a difficult and persistent problem for any organization, not just police departments. Possible metrics the HPD could consider include racial profiling data, prejudice complaint statistics, and sustained incidences of prejudice statistics.

## 03

## Review and update the HPD's current module on Taser Training.

With the number of recent events in which officers were disarmed of their Tasers ("CED devices"), it is important for the department to review its current policy concerning CEDs. A review of the use of the drive-stun application should take place to ensure officers completely understand the difficult task of using this application while attempting to secure a resisting person, especially if the officer is attempting to do so alone. Even if this application might be effective with another officer assisting, it still puts this weapon in a vulnerable position and could be taken away.

While we are not suggesting discontinuing the use of CEDs, we do understand that even when darts are deployed, there is no guarantee that the results will be effective. Therefore, officers should be trained to evaluate options that reflect the de-escalation policy of the department. This would include, but not be limited to, creating distance, continuing communication, executing cover/concealment, or holstering/securing the Taser. This training should be scenario-based to allow the officer to make decisions under as realistic conditions as possible.

## 04

## Add additional education and training on interacting with persons with disabilities, including practical application by which people with disabilities and/or professionals who work with those with disabilities play a central role in the training.

When we spoke with Houston community members with disabilities, they shared with us that they felt that some officers had a lack of understanding when interacting with persons with disabilities in the field. From the HPD Academy Training List, it appears officers receive four hours of training on "Interacting with Deaf and Hard of Hearing." However, deaf and hard of hearing is only one of many disabilities that are prevalent in the City of Houston.

According to Houston State of Health, 9.3% of people in Harris County have a disability.[56] Beyond a hearing difficulty, this percentage includes:

- **Mental difficulty:** By far the most common and most nebulous category. Examples include autism, traumatic brain injury, Down syndrome, or dementia, among many others.
- **Vision difficulty:** Someone who is blind or who has serious difficulty seeing even when wearing eyeglasses.
- **Self-care difficulty:** Because of a physical, mental, or emotional condition, the person has difficulty dressing, bathing, or getting around.
- **Ambulatory difficulty:** Someone who has serious difficulty walking or climbing stairs.

People with disabilities are more likely to experience victimization, be arrested, be charged with a crime, and serve longer prison sentences once convicted, than those without disabilities.[57] To address this, the Task Force recommends adding additional training in disability awareness, understanding, and interaction. While officers may receive some overlapping training during the CIT courses, specific training for those with disabilities might include recognizing different disabilities, effective listening, recognizing non-verbal cues, practicing stress management and alternate means of communication, applying patience, and earning a person's cooperation—all skills that might be applied differently when interacting with people with disabilities.[58]

## 05 Integrate more Scenario-Based Training into existing training modules to simulate real-world conditions.

The Fiscal Year 2021 HPD budget outlines five short term goals, including "Increase the use of Scenario-Based Training ("SBT")." SBT allows officers to participate in training that simulates, as much as possible, the actual conditions they will encounter in the field. Research recommends that "role-play scenarios are ideal—indoors and outdoors, as well as at night with dim or variable lighting, after running several blocks, with multiple opponents to think about, with other officers and bystanders on the scene, and while wearing on-duty clothing."[59]

The Task Force supports this goal and asks the HPD to prioritize this effort and add more specific metrics (e.g., How many training modules use SBT? How many more modules need SBT? How effective are modules with SBT versus without?). We recommend that these SBT modules are also evaluated to ensure they do not inherently promote implicit bias and discrimination through images, language, or actors being used.

## 06 Review and update the training module entitled "History of Policing" to include a unit about the enduring history between the Black community and the police.

By recognizing and studying the long history of racism in policing and the criminal justice system,[60] cadets can better understand the tensions and feelings of distrust and unease that exist between the Black community and law enforcement. Understanding breeds empathy, and this type of course will aid HPD officers during encounters with Black Houstonians.

## 07 Provide additional training opportunities and resources for Sergeants and Lieutenants.

Sergeants and Lieutenants are critical first-line supervisors who ensure that the vision and goals of the HPD are put into effect at the street level. They are responsible for managing the patrol officers who are seen as the "face of the department" by most community members. The Task Force recommends a review of existing Sergeant- and Lieutenant-level training modules to determine effectiveness. Updates should be made to the HPD's current offering by reviewing best practices and soliciting input from all HPD officers (i.e., those managed by front-line supervisors, front-line supervisors themselves, and those who manage front-line supervisors).

## 08 Audit and evaluate officer training on an annual basis to update modules based on officer feedback, academic experts, community input, and changing best practices.

Police training—just like police policies and practices—must be viewed as dynamic and changing. As public safety issues become increasingly complex, communities become increasingly diverse, and police departments discover new and more effective techniques, police training programs must be updated to accommodate these changes. The goal of continuing to evaluate and revise the HPD's training program is to employ the most efficient, effective, and evidence-based training process that still maintains the integrity of the methods.[61]

## 09 Audit and evaluate training instructors on an annual basis to ensure trainers are upholding the desired values of the HPD and continue to reflect the diversity of the department and the City.

Serving as a trainer is a privilege, not a right. Not only should trainers be evaluated by trainees and leadership, but also they should be assessed to ensure that they represent, support, and encompass competencies around the full spectrum of diverse communities in Houston and the HPD.

## 10

## Evaluate, screen, and train field trainers to ensure they are upholding and encouraging policing best practices.

Peter Drucker originated the phrase, "Culture eats strategy for breakfast." It is fundamentally police culture that reformers, advocates, and civilians have sought to change for decades. One guardian of that obstinate culture is the law enforcement field trainer. The Marshall Project shares, "For decades, cities have tried to change the cultures of their police departments, bringing in progressive chiefs and mandating programs to teach officers to become more compassionate and less violent." The Marshall Project believes that those efforts have not worked. "Field training officers ("FTO") are a big reason problems persist, according to current and former police leaders, academics and even the US Justice Department."[62] It is not difficult to guess why; studies have shown that performance related to skills learned during initial training typically decreases after just a few weeks.[63] Therefore, whatever trainees learn with their field officers tends to override what trainees learn in the classroom.

Derek Chauvin, the ex-police officer who murdered George Floyd, was a field trainer. To take steps to change the culture, law enforcement leaders must screen and select officers who are qualified and appropriately trained to fulfill this critical role. The HPD should consider offering incentives for qualified field trainers since they will be required to go above and beyond their traditional duties (e.g., more time spent mentoring, filling out paperwork, providing feedback).

## 11

Provide accessible and educational training materials for civilians—both about their rights when encountering law enforcement, and about tools that will help them understand the officers' experiences and points of view.

First and foremost, the HPD must make clear the rights that a civilian has during an encounter with law enforcement. Second, experiential learning programs, such as Texas Southern University's ("TSU") "shoot-don't-shoot" training simulator, can help civilians better understand what police officers face while on duty. Partnering with local universities such as TSU can help offset the costs of such initiatives.

"I'd like to see more training regarding de-escalation and empathy. The community in Houston should not be scared of the police—it should be a relationship based on mutual respect."

—TASK FORCE SURVEY RESPONDENT

## B) Prioritizing officer health and wellness

General Order 100-6 states: "The department's employees are its most valuable asset." If this is the case, committing to the continuous encouragement and support of officer mental health and wellness is essential.

### ***WHY DO POLICE OFFICERS NEED HEALTH AND WELLNESS PROGRAMING?***

Police officers and their civilian colleagues see and experience things throughout the course of their career that most of us are fortunate enough to never encounter. In January 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act, which references the research on occupational risks that affect the approximately 800,000 sworn officers in the United States. Police officer stress results in "higher rates of heart disease, divorce, sick days taken, alcohol abuse, and major psychological illnesses such as acute stress disorder, post-traumatic stress disorder ("PTSD"), depression, and anxiety disorders."[64] Research has shown that health and wellness programs addressing the physical and mental health of officers have a direct impact on the officers, their families, the agency, and the communities they serve. If the officer's physical and mental health needs are unmet, outcomes can include impaired decision-making abilities, decreased job performance, increased agency costs, and increased risk of self-harm or suicide.[65]

### ***WHAT TYPES OF HEALTH ISSUES ARE COMMON AMONGST POLICE OFFICERS?***

Health and psychological disorders affecting police officers include but are not limited to:

**Post-traumatic stress disorder ("PTSD").** On average, approximately 15% of officers in the US experience PTSD. This rate is similar to military veterans. The general population rate is 3.5%.

**Suicide.** Risk of suicide is highest among police officers as compared to any other profession, and is the leading cause of death for officers. The National Alliance on Mental Health reported that one in four police officers has considered committing suicide, and more officers die from suicide each year than they do in the line of duty.

**Lower life expectancy.** The life expectancy of police officers is fifteen years less on average than the general population. Police officers tend to have higher rates of cardiovascular risk factors such as obesity, hypertension, sleep disorders, and metabolic abnormalities (elevated blood glucose, triglycerides, and cholesterol).

## *WHAT SERVICES DOES THE HPD PROVIDE CURRENTLY TO ITS OFFICERS?*

The HPD has a Psychological Services Division that has seven full-time psychologists who provide free services to both sworn officers and civilian employees, as well as their families. Based on conversations between the Task Force and a psychologist in the Psychological Services Division, the services are currently underutilized. There is no official data on the number of sworn officers or civilian employees who sought treatment, the reasons for treatment, type of treatment provided (individual, marital, or family therapy), or average number of visits.

There are no mandatory or routine psychological evaluations required for HPD officers after the start of their employment, with the exception of four incidents after which psychological evaluations are mandatory (GO 200-04, Assistance to Employees Involved in Critical Incidents; GO 300-02, Transfer of Classified Employees; GO 300-09, Absence from Duty - Classified; and GO 300-10, Transitional Duty). It is important to note that GOs 200-04 and 300-02 have not been updated since August 2013 and July 2014, respectively. It is unknown how effective the Psychological Services Division is in meeting the emotional and mental needs of the officers and civilian employees who have higher rates of exposure to trauma related incidents or information. It is also important to note that an annual physical exam is not required by the HPD.

## *WHAT ARE TCOLE'S MINIMUM REQUIREMENTS FOR PSYCHOLOGICAL EVALUATIONS OF OFFICERS?*

Officers can be examined by a psychologist or psychiatrist. They must complete the required approved psychological form within 180 days prior to their date of appointment. The examination must be conducted according to professionally recognized standards and methods and must consist of:

1. Review of a job description for the position sought
2. Review of any personal history statements
3. Review of any background documents
4. Administration of at least two assessments measuring personality traits and psychopathology
5. Face-to-face interview after the instruments have been scored

## *WHAT RECOMMENDATIONS DOES THE TASK FORCE HAVE REGARDING OFFICER HEALTH AND WELLNESS?*

**12**

### Conduct psychological evaluations of cadets.[66]

In addition to the minimum TCOLE requirements for acceptance into the Academy Training Program, include at least one Trauma Assessment Tool and the Psychosocial Assessment:

**Trauma Assessment Tools**

- **Childhood Attachment and Relational Trauma Screen ("CARTS")** asks about a person's relationship with key people in their lives when growing up.
- **Global Psychotrauma Screen ("GPS")** is a 22-item questionnaire with yes/ no answers that covers a variety of different potential conditions related to trauma, such as PTSD, anxiety, depression, childhood trauma, substance abuse, problems sleeping, and more.
- **Clinician-Administered PTSD Scale (CAPS)** is a 30-item questionnaire that is a structured interview.

The benefits of trauma assessment tools are to assist with identifying a history of past trauma and to rate the degree to which the trauma affects the person. Also, one of the screening tools could be used to reassess the officer's level of trauma during the course of employment.

**Psychosocial Assessment**

A psychosocial assessment evaluates a person's mental, physical, and emotional health. It takes into account the person's perception of self and his or her ability to function in the community. It explores how one's environment has influenced one's behavior since early childhood to the present. The primary benefit of a psychosocial assessment is to ensure a standardized interviewing process. This assessment is usually administered by a social worker and takes more than an hour to complete.

## 13

## Update and revise GO 200-04: Assistance to Employees Involved in Critical Incidents.[67]

**Post-Critical Incident Intervention**

- Make the referral to the Psychological Services Division routine and mandatory. This will not only offer added support to officers, but also work to reduce the stigma of seeking psychological treatment after a critical incident.
- As soon as possible after the incident, a mental health professional, supervisor, or fellow officer should check in with the identified officer(s) involved.
- The employee should have the option to seek treatment from one of psychologists at the Psychological Services Division or from one of the providers through the Employee Assistance Program ("EAP") who has experience with law enforcement and trauma-related issues.

It was reported that there are approximately 2,000 EAP providers available to HPD employees; however, it is unknown how many of these providers have experience working with police officers or individuals with PTSD, trauma-related disorders, or other emotional/mental conditions most commonly seen in law enforcement. The HPD should compile a list of EAP providers who can best meet the emotional and mental needs of officers based on their level of experience and expertise, and disseminate the list to officers and civilian employees.

## 14 Implement periodic psychological screening for all officers.[68]

- Screen officers, communications, and crime lab personnel who have increased exposure to trauma-related incidents or occurrences at a minimum of once every twelve months. Currently, the HPD does not perform psychological evaluations beyond the initial screening, unless the officer is being transferred to a specific division as identified by the HPD.
- Monitor stress levels, biases, overall attitude, and coping skills.
- Administer one of the trauma screening tools (CARTS, GPS, or CPS) as listed above.
- Screen for substance/alcohol abuse and suicidal ideations.

Implementation of mandatory and routine psychological or "mental health checks" can be an effective preventive approach to decreasing the suicide rate and psychological sequela reported in law enforcement. The mental health checks would be performed annually for 30-90 minutes. Making the visit routine and mandatory would decrease the stigma of seeking treatment. It is important to note that these visits are not meant to punish or weed-out officers; rather, these checks these checks acknowledge the mental strain of policing, support officers in need, and provide proactive intervention.

## 15

## Increase marketing and utilization of the Psychological Services Division and employee assistance programs.[69]

The psychological services available to the officers and civilian employees are currently underutilized by HPD employees.

- Provide in-service training on mental health topics to include suicide prevention, stress management, PTSD, substance use disorder, domestic violence, depression, anxiety, bipolar disorder, anger management, single parenting, and officer burnout. Both professional and personal topics should be addressed.
- Conduct surveys to determine officer needs. Leadership will need to be actively involved. We recommend surveys be conducted twice a year.
- Promote and encourage during training the use of psychological services and other resources available to the officers (i.e., peer support groups, helplines, and mentoring programs).
- Disseminate a monthly newsletter electronically. The content should include services provided and contact information for the Psychological Services Division, wellness topics, tips and events, and resource information.
- Identify the EAP providers who have experience counseling law enforcement personnel and providing cognitive behavioral therapy or other trauma therapy modalities.
- Collect additional service-related data, including but not limited to, number of contact visits identified by officers, spouses/significant others, or children of officers, civilians; type of service received; reason for visit; general demographics; no shows; less than 24-hour cancellation; and reason for cancellation.
- Promote COPLINE (a suicide prevention hotline for officers) and HOPA (retired HPD officers trained to listen).
- Continue to encourage participation in the Peer Support Group program.

## 16 Update and revise GO 300-02: Transfer of Classified Employees, Section 12, Voluntary Transfers.

**We recommend that proactive investigators be evaluated and attend a psychological counseling session annually.**

## 17 Implement a health and wellness program.

**We recommend that a comprehensive health and wellness program be implemented to assess the physical, mental, and emotional health of the officers and civilian employees on an annual basis. The current Psychological Services Division can be expanded to incorporate yearly mental health checks since the services are currently being underutilized. The Physical Fitness and Agility Program (General Order 300-19), Peer Support Program, Mentorship Program, and other supportive programs and resources could be included under the Wellness Program. We also recommend offering the option to seek ongoing psychological services outside the department.**

"I think all police departments could use a hefty dose of therapy as part of their day-to-day job... not just when there's an incident.

Just like veterans, if we're going to ask them to do a dangerous job for us, we have to be there for them, and give them the tools and skills to do the job."

—TASK FORCE SURVEY RESPONDENT

## C) Offering additional support initiatives

Additional initiatives should be considered to help officers in the field.

**18**

### Institute a Mentorship Program for officers.

The HPD has a significant number of officers on the cusp of retiring, meaning the department as a whole will skew younger for a number of years. The Lansing Police Department instituted a mentorship program at a similar time in its history. New recruits completed a questionnaire and were then paired with a "best available match" from a group of pre-screened and specially trained officers, who supported the recruits through their academy experience and integration into the department.[70]

To serve as a mentor, an officer had to be viewed as a positive role model, have above-average interpersonal skills, and be willing to devote time above and beyond the structured meeting schedule. Mentors also received eight hours of training and were offered refresher courses to discuss their experiences and to provide them with additional tools.[71]

**19**

### Solicit input and feedback through a departmental survey and assessment on an annual basis.

Conducting periodic employee input surveys is a common practice in the private sector, as it facilitates real-time feedback-sharing across divisions and ranks. Within the HPD, this process should include departmental interviews, anonymous surveys, a review of policies and procedures, feedback on officer training, and an analysis of performance data. Assessment at regular intervals would more proactively reveal challenges, unmet needs, and patterns of behavior that can be addressed through departmental changes.

## 20 Issue work phones to HPD officers.

The HPD only issues work phones to select officers, and current policy prohibits officers from using their personal cell phones for work-related matters. In contrast, the NYPD issues smartphones to its officers, allowing them to:

- Replace handwritten memo books with a department app that allows officers to type their notes and immediately send them to a department database. Department officials "say the transition will help eliminate possible abuses, such as faking entries, and having to sort through indecipherable handwriting... It's not just going from paper to a digital app — it's changing the culture," said Chief Tasso.[72]
- Give officers the ability do quick searches themselves of department databases, instead of waiting for busy radio dispatchers to relay information.[73]
- Call a city-contracted service that provides immediate access to interpreters in more than 240 languages, allowing them to better serve residents who do not speak English.[74]

Issuing work phones to HPD officers will help streamline officers' execution of their responsibilities in the field.

KEY TAKEAWAY

—

A more holistic approach to officer readiness—including in-context training, mental health care, and the full support of the department—is critical to ensure clearer judgment, better decision-making, and sustainable change in the field.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

### SHORT TERM
WITHIN 90 DAYS

—

- 03: Taser training
- 05: SBT training
- 08: Training audit
- 09: Training instructor audit
- 10: Field trainer screening
- 11: Civilian training
- 12: Psychological evaluations
- 13: GO 200-04 revision
- 15: Psychological services
- 16: GO 300-02 revision
- 18: Mentorship program
- 19: Departmental survey

### MEDIUM TERM
WITHIN 6-12 MONTHS

—

- 01: De-escalation training
- 02: Implicit bias training
- 04: Disability training
- 06: History of policing module
- 07: Leadership training
- 14: Periodic psychological screening

### LONG TERM
1 YEAR+

—

- 17: Health and wellness program
- 20: Work phones

# CLEAR EXPECTATIONS

Set clear and unambiguous expectations for officers so that they feel supported, know exactly what behavior is required, and understand the consequences of their action or inaction.

## WHY 'CLEAR EXPECTATIONS'?

Policies, rules, and expectations should aid officers in their everyday work, not cause confusion or detract from their ability to execute the department's mission to protect and serve our City.

In this section, we will discuss the need for the HPD to ensure that departmental expectations are clearly understood by officers and community members alike. Policies that are not clearly written or that are applied inconsistently make it far too difficult for officers to fulfill their daily responsibilities.

## *WHAT RECOMMENDATIONS DOES THE TASK FORCE HAVE REGARDING EXPECTATION-SETTING WITH OFFICERS?*

**01**

### Conduct a complete review and update of the entire HPD General Orders, looking specifically for GOs which contain contradictions or ambiguities, and revise for best practices.

Police officers that we spoke with shared that it can be almost impossible to keep straight all of the rules stated across various documents, including General Orders, Circulars, Executive Orders, the "Meet and Confer" agreement, and training manuals, among others. The HPD should form a small working group to review all written policies and documentation to streamline and consolidate policies that govern all police activities. In addition to including officers and experts in the working group, the HPD should include community representatives and take into account community input to ensure the HPD is practicing policing that continues to reflect the community's values, needs, and priorities directly related to public safety.

**02**

### Review departmental policies annually to ensure they reflect updated standards and changing best practices.

The HPD's policies and practices must be continually reviewed, evaluated, and updated to reflect the current best practices and changing needs of the Houston community. Any changes to policies should be accompanied by appropriate officer training. Simply sending out a circular to officers and asking them to internalize it is no longer enough.

## 03 Publish disciplinary policies internally and stick to them.

Over the course of our research, some officers shared that they felt certain officers received less severe punishment than others for the same misconduct, or that they were not aware that they would be punished for a particular action.

The HPD should publish a "disciplinary schedule," informed by a review of civilian complaints, departmental complaints, and existing policies. Policy Link recommends creating a "written directive that identifies types of inappropriate behavior and establishes a matrix with ranges of appropriate discipline for each behavior. The schedule helps to conform multiple supervisors' disciplinary actions to a shared departmental standard."[75] Officers should be trained on the disciplinary schedule and refreshed on it each year. This way, discipline will be more consistent and predictable, and officers will have a clear understanding of how their actions will be dealt with by the department.

## 04 Include "educational" or "positive discipline" as a response to certain misconduct instead of "financial discipline."

Currently, HPD officers who make a mistake or violate a policy often receive "financial discipline," meaning the Chief will give them time off without pay. Instead, certain defined violations should result in positive discipline such as counseling or retraining to ensure that an officer understands the policy and can avoid making the same violation in the future.

## 05

## Promote HPD Commanders through the standard, systematic promotional process as opposed to through "civil service."

All positions above the Commander rank (Assistant Chief, Executive Assistant Chief, and Chief) require selection and appointment by the Chief of Police and/or the Mayor. However, the Commander rank—including Sergeant and Lieutenant ranks—still falls under civil service protection. Civil service protection guarantees Commanders their positions for life, and unless they exhibit gross negligence or egregious misconduct, they can rarely be disciplined or fired.

The Commanders lead entire divisions within the HPD and wield significant authority and influence. Officers in these powerful positions should be held accountable to those that they serve and protect. With the demand for a cultural shift in policing, the Task Force recommends that Commanders be selected by the Chief and subsequently appointed by the Mayor. Additionally, the Chief of Police should have the ability to recommend additional Commanders to the Mayor, if he or she finds it necessary to expand high-level supervision in specific areas.

"Support the 'good guys'—honest cops who tell the truth and behave in an exemplary fashion should be honored, promoted, and held up as strong positive examples of what it means to be a cop."

—TASK FORCE SURVEY RESPONDENT

KEY TAKEAWAY

## We cannot expect fair and equitable policing if we do not set clear expectations and apply them consistently.

# ACCOUNTABILITY

The Task Force has taken the initiative to suggest time frames for the implementation of each reform detailed in this section. At a minimum, we would expect a status update on these recommendations within the given range.

SHORT TERM
WITHIN 90 DAYS
—

02: Policy review
04: Positive discipline

MEDIUM TERM
WITHIN 6-12 MONTHS
—

01: Update general orders
03: Disciplinary policies
05: Promotion process

LONG TERM
1 YEAR+
—

*N/A - continue to build on proposed initiatives*

# CONCLUDING THOUGHTS

*"When you see something that is not right, you must say something. You must do something. Democracy is not a state. It is an act, and each generation must do its part to help build... a nation and world society at peace with itself."*

—JOHN LEWIS

Democratic governance can be messy. It can all too easily be derailed by petty fighting, short-term thinking, or bureaucratic inefficiency. But at its best, democracy is fueled by people who listen, engage, and challenge one another to achieve more together than they can alone.

This perspective is no more evident than in the formation of this Task Force and the execution of our work. Writing a clear, cohesive document by committee is hard.

Uniting 45 human beings with different backgrounds, jobs, and dispositions to critically examine complex issues is demanding. We did not always agree with one another. We did not always share the same experiences or viewpoints. But critically, we listened. To each other. To experts. To people on the front lines. To you.

At the end of the day, we, the members of this community-led Task Force, stand united with each other in support of positive change in policing. There are over 100 recommendations included in this report. To sit back and pick apart one or two is to miss the point. As many leaders have already noted, it is far too easy for people from both sides—the community and the police—to hide behind cynical soundbites, incendiary social media posts, or provocative headlines. Rising above these all-to-easy, idle responses will take hard work. But it is necessary work. Good work.

We approached our Mayor's charge with guiding principles that helped shape our analysis and recommendations. These principles included transparency, accountability, community

involvement, diversity and inclusion, leadership, and a holistic understanding of health and wellness, for both sides. *For both sides*. Critically, we did not come to the table pointing fingers. We did not and do not seek to further a divide between "us" and "them." The only way to create meaningful, lasting change in policing is through a mutual partnership between the police and those that they serve: the community.

Changing culture is a movement, not a mandate. Long-term change in any organization is dependent on both its leadership and its people. Leaders must serve as models for change through their words and actions. It is not enough to offer up cheap assurances or say the "right" thing on TV. Change is hard, and humans are notoriously bad at accepting it. Therefore, leaders must also mentor and support their front-line workers as they adjust to a new reality. Culture will change when people feel respected, internalize the department's mission and purpose, and are equipped to carry out that mission every day.

This process and this report are just the beginning. Phase one.

The next step is implementation. We cannot do it alone. The Mayor cannot do it alone. The HPD cannot do it alone. So, we ask you: where do you stand? Will you critique from afar? Will you stay on the sidelines and do nothing? Or will you participate with us, take ownership, and demand action?

Stand with us now, for change.

Respectfully Submitted,

**The Mayor's Task Force on Policing Reform**
Houston, Texas

## Task Force Members

Gerry Birnberg
Dr. Carla Brailey*
Terry Bratton
Rose Brown
Judge Marc Carter
Mary Champion Closner
Deric Childress, Jr.
Shekira Dennis
Michael Dirden
Bishop James Dixon*
Bishop C. Andrew "Andy" Doyle
Tanya Dubose
Cesar Espinosa*
Rabbi Gideon Estes
Dr. Kathy C. Flanagan
Deborah Fowler**
Bill Fulton
Mamie Garcia*
Shariq Abdul Ghani**
Harrison Guy
Bob Harvey
Dr. Howard Henderson*
Pastor Jamail Johnson
Leonard Kincaid*
Alice Lee
Timothy Luckey
Rania Mankarious
Dr. Max A. Miller, Jr.
Keith Mosing
Deric Muhammad**
Dr. Laura Murillo
Pastor Jose Ortega
Angel Ponce
George Rhyne
Judson Robinson III
Dr. Robert Satcher
David Shin
Bobby Singh*
Trae tha Truth
Kirk Watson*
Rev. Dr. Steve Wells*
Emilee Whitehurst
Jaylon Wingfield
Lacy Wolf*
Wayne Young

*Indicates a Committee Co-Chair
**Indicates a Sub-Committee Chair

## Special Advisors To The Task Force

Archbishop Joseph Fiorenza
Rabbi Samuel Karff
Reverend William "Bill" Lawson
Pastor James Nash
Mary Ramos

## Research Assistants

Jennifer Bourgeois
Arelia Johnson
Melissa Kwende
Alexandria Roberts
Steve Sherman

Laurence J. "Larry" Payne
Chair, The Mayor's Task Force on Policing Reform

Brooke Schuler
Chief of Staff and Executive Editor

Ellen Wilcox
Lead Designer and Editor

# ACKNOWLEDGMENTS

First and foremost, the Task Force would like to thank the thousands of Houston residents who responded to our public input questionnaire. Thank you for taking the time to engage with us and share your stories. Your contributions to our work were invaluable.

Many other people contributed to the execution of this report, and our gratitude extends to:

Those who generously hosted us, safely and socially distanced, for our in-person meetings:

- **John Gonzalez** and his team at the George R. Brown Convention Center
- **Jacques D' Rovencourt** and his team at the Hilton Americas-Houston Hotel
- **Hudson Davis, Sheri Suarez Foreman, Katharine Hatcher, Ric Hodgin, Michael Mullins, Jake Speck, Christy Watkins,** and their team with the A.D. Players at The George Theater
- **Rev. Phillip Lloyd, Enrique Benitez,** and their team at St. Theresa Catholic Church
- **Rev. Patrick Miller, Tina Moses,** and their team at St. Mark's Episcopal Church
- **Dr. Richard Ludwick, Shannon Broussard,** and their team at the University of St. Thomas

**Janice Weaver**, Director of Community Relations, and **Maria Montes**, Director of Boards and Commissions, and their respective teams, at the Houston Mayor's Office. Thank you for supporting us, organizing us, and advocating for us.

**Diana Poor**, Deputy Director / Chief Data Officer, and **Melissa Cummins**, Police Administrator, at the Houston Police Department. Thank you for your tireless and patient efforts to respond to and collect data to answer our many questions.

**Karlton Harris** with the Houston Peace Coalition, who along with **Jacqueline Potter**, recruited and moderated a thoughtful, eye-opening "youth voices" panel for our Task Force. Panel members included **Austin Ivery-Clemons, Khoi Tran**, and **Kevin Alvarado**. We thank you for your time, honesty, and stories.

The current and former HPD Police Chiefs, including **Chief Art Acevedo, Executive Assistant Chief Troy Finner, Executive Assistant Chief Matt Slinkard, Dr. Lee P. Brown, Chief Charles McClelland, and Chief C.O. "Brad" Bradford**, all of whom shared their experiences, thoughts, and recommendations with the Task Force. Thank you for giving us serious consideration and engaging with our members as we asked questions and posed ideas.

Finally, thank you to the various organizations and individuals who sent letters/memos in or met with us virtually to share their stories, ideas, and recommendations, including but not limited to:

- Dr. Kristen Anderson
- Assistant Chief Wendy Baimbridge
- Detective Eric Carr
- Sergeant Jason Cisneroz
- Inspector General Robin Curtis
- Commissioner Adrian Garcia
- Daniel Garcia
- Sergeant Domingo Garcia
- Ray Hunt
- Sergeant DeAndre Hutchison
- Jonathan Lack
- Christian Menefee
- Sergeant Roland Nieto
- Chief Victor Rodriguez
- Officer Jed Rose
- Ray Shackelford
- AAPOL
- Crime Stoppers
- Eta Rho Sigma Alumni Chapter of the Phi Beta Sigma Fraternity
- Houston Area Urban League and their survey respondents
- Houston Commission on Disabilities
- Houston Office of New Americans and Immigrant Communities
- Houston Peace and their youth survey respondents
- Mayor's LGBTQ Advisory Board
- Theta Chi Chapter of the Omega Psi Phi Fraternity

# APPENDIX A:

## For Such a Time as This

Written by Laurence J. "Larry" Payne,
Chair, The Mayor's Task Force on Policing Reform
September 2020

1. Building lives full of the promise of tomorrow requires addressing the underlying systematic inequities highlighted by recent events.
2. True solidarity requires humanity, acceptance, and shared experiences, especially during difficult times.
3. This moment is an opportunity to acknowledge the urgent need to fight the racial and economic inequities that we, as a society, have allowed to persist, far too long.
4. To be empowered is to be able to act. Power is the ability, capacity and willingness of a person, a group of people or an institution, to act.
5. To change the system – What is a system? An organized body of people gathered around values and structures and individuals.
6. Values are defined; structures are put in place to implement systems: people are identified to maintain structure/ institutions.
7. Systemic Change occurs when value, structures, and individuals change.
8. We must create space for ourselves to see through someone else's eyes.
9. What is known as unconscious or implied bias is what holds us back and blocks the best intentions and attempts of so many to achieve meaningful change.
10. It is time for a re-centering in this country on how we are supposed to treat each other. Rather than how we are not supposed to treat each other.
11. Remember, you cannot protest an idea; you can only counter it with a better idea.
12. Our ability to exercise extreme empathy toward everyone in our communities and beyond will determine what kind of Houston we leave for other generations to imagine.

# APPENDIX B:

## Must-reads on policing reform

Submitted by Dr. Howard Henderson,
Founding Director of the Center for Justice Research at TSU
September 2020

1. Race and the Houston Police Department, 1930-1990 (Amazon)
2. US: 14 Recommendations for Fundamental Police Reform; Improve Public Safety by Reducing Policing, Investing in Communities (Human Rights Watch)
3. Campaign Zero - information about existing policies (Campaign Zero)
4. Policing Black Bodies: How Black Lives are Surveilled and How to Work for Change (Rowman & Littlefield)
5. State of Opportunity in American Report (Advancing Opportunity)
6. Meaningful Police Reform Requires Accountability and Cultural Sensitivity (Brookings Institute)
7. Officer-Involved Shootings in Texas (2016-2019) (Texas Justice Initiative)
8. Most Americans Say Policing Needs "Major Changes" (Gallup)
9. The Racist Roots of American Policing: From Slave Patrols to Traffic Stops (The Conversation)
10. The President's Role in Advancing Criminal Justice Reform (Harvard Law Review)
11. Before attempting to reform the police, we must discover what actually works (Marketwatch)
12. Chokehold: Policing Black Men (Amazon)
13. Hands Up, Don't Shoot (Amazon)